In The



Court of Appeals



Ninth District of Texas at Beaumont



 ______________________ 


 

NO. 09-07-410 CV


 ______________________



IN THE INTEREST OF A.E.M.S.


 




On Appeal from the 317th District Court


Jefferson County, Texas


Trial Court No. C-192,696-A







MEMORANDUM OPINION

 C.B., the father of A.E.M.S., appeals from the trial court's order on his motion to
modify in a suit affecting the parent-child relationship. We affirm the trial court's order.

Background


 Pursuant to chapter 231 of the Family Code, K.S. (through the Texas Attorney
General) filed a petition to establish the parent-child relationship between C.B. and the minor
child, A.E.M.S. Finding C.B. is the biological father of A.E.M.S. the trial court named K.S.,
the mother of A.E.M.S., as the "primary joint managing conservator or managing
conservator," and C.B. as the "joint managing or possessory conservator." Over a year and
a half later, C.B. filed a motion to modify the SAPCR order and requested that he be
appointed as "the person who has the exclusive right to designate the primary residence of
the child." At the conclusion of the bench trial, the trial court appointed K.S. and C.B. as
joint managing conservators with K.S. having the right to designate the child's primary
residence within 100 miles of the Jefferson County Courthouse. (1) The order required C.B.
to pay child support. C.B. filed a notice of appeal. K.S. claims the appeal is frivolous. 

Standard


 We review a trial court's decision on a motion to modify the parent-child relationship
under an abuse of discretion standard. In the Interest of M.A.S., 233 S.W.3d 915, 919-20
(Tex. App.--Dallas 2007, pet. denied). A trial court abuses its discretion when the court acts
in an arbitrary or unreasonable manner or when it acts without reference to any guiding
principles. Id. at 920. 

 The trial court made findings of fact and conclusions of law. In a case tried to a court,
findings of fact have the same dignity and force as a jury's verdict upon special issues. 
Seidel v. Seidel, 10 S.W.3d 365, 368 (Tex. App.--Dallas 1999, no pet.). The trial court, as
trier of fact, evaluates the witnesses, assigns the weight to be given their testimony, and
resolves any conflicts or inconsistencies in the testimony. Young v. Young, 168 S.W.3d 276,
281 (Tex. App.--Dallas 2005, no pet.). "[O]nce it has been determined that the abuse of
discretion standard applies, an appellate court should engage in a two-pronged inquiry: (1)
Did the trial court have sufficient information upon which to exercise its discretion; and (2)
did the trial court err in its application of discretion?" Norris v. Norris, 56 S.W.3d 333, 338
(Tex. App.--El Paso 2001, no pet.). 

 Section 156.101 of the Texas Family Code provides, in pertinent part, that a trial court
may modify an order appointing conservators and establishing conditions of conservatorship
if (1) modification would be in the best interest of the child and (2) "the circumstances of the
child, a conservator, or other party affected by the order have materially and substantially
changed since the . . . date of the rendition of the order." Tex. Fam. Code Ann. §
156.101(1)(a) (Vernon Supp. 2008). In determining issues of conservatorship and possession
of and access to a child, the best interest of the child is the trial court's primary concern. 
Tex. Fam. Code Ann. § 153.002 (Vernon 2002); see also Tex. Fam. Code Ann. § 156.101
(Vernon Supp. 2008); In re Hood, 113 S.W.3d 525, 529 (Tex. App.--Houston [1st Dist.]
2003, orig. proceeding). 

Issues


 In issue one, C.B. contends the trial court abused its discretion by awarding primary
conservatorship to K.S. In effect, he argues the trial court erred in concluding that it is in the
child's best interest for K.S. to have the right to designate the child's primary residence. He
challenges the finding that K.S. has been the sole and primary caregiver to the child since the
child's birth and the finding that "it appears that prior involvement by the father has been
primarily through the efforts of the mother to create and maintain a relationship between
father and the child." C.B. argues that although these findings "assume [he] did not care to
have anything to do with seeing or possession [of] the child before a court order was finally
entered," the evidence shows otherwise. He asserts that K.S., in an effort to control
possession of the child, hid her pregnancy from him. He states he did not learn A.E.M.S. was
possibly his child until July or August 2004, and K.S. never allowed him to have possession
of the child until court "orders were placed in effect." C.B. also points to evidence of K.S.'s
repeated moves: he states K.S. moved at least twenty-one times in her life, and she only had
a place of her own on two occasions. C.B. challenges the trial court's finding that he denied
parentage until the time of the entry of the December 2004 order and has provided minimal
financial, physical or emotional support for the child since her birth. (2) 

 A review of the record reveals conflicting evidence. CB presented evidence that he
visited A.E.M.S. in the years after her birth and that K.S. was "controlling" in her allowance
of visitation. K.S. presented evidence that she wanted C.B. in her daughter's life and
encouraged him to see the child, but he visited the child only sporadically. C.B. testified K.S.
told him she did not know she was pregnant until the sixth month. C. B. was not convinced
he was the father, and he had a DNA test performed. There is evidence he did not tell K.S.
he was the child's father and "didn't file to establish paternity." 

 In his brief, C.B. references K.S.'s frequent changes of residence. From the time of
the first SAPCR order, K.S. moved frequently, usually from one relative to another. Three
of the moves were to the homes of friends and C.B.'s relatives who invited K.S. and the child
to live with them. K.S.'s relatives (her mother and grandmother) also provided places for
K.S. to live. On two occasions, she had an apartment. C.B. also references the period from
October 2005 to March 2006 when K.S. took A.E.M.S. to Ireland for a visit with her
relatives. In spite of K.S.'s frequent change of residences, there is evidence in the record that
C.B. visited A.E.M.S. at his relatives' homes or at the babysitter's home when K.S. was not
around. 

 K.S. struggled financially from the time A.E.M.S. was born and, as C.B. asserts,
moved frequently. She worked at a store but quit her job after the store reduced her hours
to the point where her medical insurance ended. She also worked at a flooring center and a
wedding coordination business. K.S. started college but later quit. At one point, she was
working full time, going to college, and taking care of a young child with the assistance of
others. Although she moved numerous times after A.E.M.S. was born, K.S. primarily stayed
with C.B.'s or her own relatives. In late 2005 and early 2006, K.S. was out of work and took
the child to Ireland for five and one-half months to live with relatives. While in Ireland, she
asked C.B. what he thought of her returning to the United States and taking A.E.M.S. to live
in Colorado. In an e-mail to K.S., C.B. stated that Colorado, "wouldn't be that far to come
visit." 

 C.B. has been in the same location for seven years and owns his house. He has
worked for the same company for seven years. He is married and testified he is able to
provide the child a "stable life and home and environment[.]" 

 The record reveals that C.B. knew from DNA tests results obtained in July or August
2004 that he was the child's father; however, he did not tell K.S. this information. C.B.'s ex-girlfriend told K.S. in November of 2004 C.B. had a DNA test done that showed he was the
child's father. As to child support, there is evidence that K.S. did not want to receive child
support from C.B., because she was afraid he would attempt to control her and the child. 
There is also evidence that whenever C.B. gave K.S. money, she accepted it. C.B. testified
he gave K.S. money for A.E.M.S. on August 13, 2004, March 2005, May 2005, and August
2005. He and his sister-in-law testified C.B. also gave K.S. cash at times. 

 C.B. had another child by a different woman approximately two months before K.S.
gave birth to A.E.M.S. He testified that although there is no child support order for his son,
he voluntarily pays L.F., his son's mother, $300 a month for that child. Likewise, there was
no child support provision for A.E.M.S. in the original SAPCR order. In contrast to the $300
per month he paid L.F. for the support of his son, there is evidence C.B. paid significantly
less than that for the support of A.E.M.S. 

 In the affidavit attached to his petition to modify, C.B. stated K.S. had not given him
her phone number at the time she moved out of state. However, there was evidence at trial
that the statement in his affidavit was false, because he had her cell phone number. C.B. also 
acknowledged at trial that he made an incorrect statement in a motion he filed with the trial
court to try to prevent K.S. from getting the child back. 

 Finally, there is evidence in the record that K.S. met a man on the internet, went to
North Carolina to meet him, and took A.E.M.S. with her. C.B. testified he told K.S. before
she left that the man had a long criminal record and that he did not feel comfortable with her
taking the child out of the state. K.S. testified she did not know of the extensive criminal
record before she went to North Carolina. She indicated the man had told her he had a few
barroom fights when he was younger, and that was the extent of his criminal record. Other
witnesses offered conflicting testimony on the criminal record issue as well. K.S. testified
that once she learned of the criminal record, she never saw or had contact with the man again. 
 With conflicting evidence in the record, the trial court was free to evaluate the
witnesses' credibility, weigh the evidence, and resolve any conflicts regarding best interest
and changed circumstances. The trial court may have found that K.S., along with those
corroborating her accounts, offered the more credible testimony. There is sufficient evidence
to support the findings of fact challenged by C.B. The trial court did not abuse its discretion
in appointing K.S. as joint managing conservator with the right to designate the primary
residence. We overrule issue one.

 In issue two, C.B. argues the trial judge abused his discretion in failing to give the
child the father's surname. Two sections of the Family Code cover name changes of a child. 
Section 160.636(e), contained in the adjudication-of-parentage chapter, provides that "[o]n
request of a party and for good cause shown, the court may order that the name of the child
be changed." Tex. Fam. Code Ann. § 160.636(e) (Vernon 2002). Section 45.004(a) of the
Family Code is contained in the chapter entitled "Change of Name." Tex. Fam. Code Ann.
§ 45.004(a) (Vernon Supp. 2008). Under section 45.004(a), the court may order a child's
name to be changed if the change is in the child's best interest. Id. Section 160.002 contains
a conflicts provision stating that a provision in chapter 160 controls if there is a conflict with
another provision of Title 5, (3) another state statute, or rule and the conflict cannot be resolved. 
 See Tex. Fam. Code Ann. § 160.002 (Vernon 2002); see also In the Interest of M.C.F., 121
S.W.3d 891, 894-95 (Tex. App.--Fort Worth 2003, no pet.). Section 160.636(e) applies in
the adjudication-of-paternity context and section 45.004 applies in other SAPCR contexts. 
We see no conflict between the provisions under the circumstances here. In both contexts,
an appellate court reviews the trial court's decision regarding a child's name change under
an abuse of discretion standard. See In the Interest of C.B.M., 14 S.W.3d 855, 862 (Tex.
App.--Beaumont 2000, no pet.); In the Interest of M.C.F., 121 S.W.3d at 894-95; In the
Matter of Guthrie, 45 S.W.3d 719, 723-27 (Tex. App.--Dallas 2001, pet. denied). 

 On appeal, C.B. states he was not represented by counsel at the time of the entry of
the December 2004 paternity order and did not know he had a right to change the surname
of A.E.M.S. The record does not show either party was represented by an attorney. The
paternity order was agreed; C.B. signed it; and there is no indication in the record that he
complained below of lack of representation at the December 2004 hearing. The pleadings
alleging his paternity put him on notice of matters regarding a name change with the bold
heading "Name Change, " but nothing in the record shows that C.B. requested the change. 
The Texas Supreme Court has held that a father does not have a constitutional right to have
his child bear his name. Newman v. King, 433 S.W.2d 420, 422-23 (Tex. 1968); see also
generally In the Interest of M.C.F., 121 S.W.3d at 897 (Texas does not grant to either parent
an express right to name a child.) (citing In the Matter of Guthrie, 45 S.W.3d at 724.). C.B.
waived any complaint about the name change in the paternity order because he did not raise
it at that juncture. 

 In the motion to modify, C.B. requested the child's name be changed to his surname. 
(1CR:90-91) This request falls under section 45.004 and has the "best interest of the child"
standard. See Tex. Fam. Code Ann. § 45.004. Of secondary importance are the parent's
interests and desires. See In the Matter of Guthrie, 45 S.W.3d at 723-724. The Guthrie court
set forth various factors for determining whether a name change is in the child's best interest.

We consider those factors. The record reveals that A.E.M.S. was three years old at the time
of the June 2007 order and has carried her mother's surname since birth. The evidence does
not show there would be embarrassment if the child kept K.S.'s surname or that it would be
more convenient or easier for A.E.M.S. to have the same name as C.B. C.B.'s sister-in-law
testified she did not know of any particular degree of respect attached to C.B.'s surname in
their community. A.E.M.S. has never lived with C.B. A.E.M.S.'s half-brother, who carries
C.B.'s surname, does not live in the household with C.B. K.S. and A.E.M.S. have lived
together continuously since the child's birth; there is no evidence of confusion or
inconvenience or failure to identify with a family unit if the child continues to carry K.S.'s
surname. As noted, C.B. did not inform K.S. he was the child's father; his ex-girlfriend told
K.S. about the DNA test results in November 2004, close to the time of the December 4,
2004, parental adjudication hearing. The record contains evidence that C.B. did not
consistently help K.S. support the child.

 There is no evidence to show that, should the trial court not change the child's
surname to that of C.B., the bond between C.B. and his family members and the child would
be adversely affected. The record does not indicate the child at three years of age had a
preference. K.S. testified she has no plans to change her name if she marries, because she
indicated she felt "awkward" as a child by not having the same surname as her mother. The
trial court did not abuse its discretion in refusing to give the child the father's name. We
overrule issue two.

 In issue three, C.B. asserts the trial court abused its discretion "by not restricting the
residence of the child to within Jefferson County or the State of Texas." C.B. argues the
breadth of the residency provision will allow K.S. to ultimately have the case transferred to
Louisiana. 

 The order appoints K.S. and C.B. as joint managing conservators of A.E.M.S. and
gives K.S. "the exclusive right to designate the primary residence of the child within 100
miles of the Jefferson County Courthouse. . . ." Section 153.134 of the Family Code
provides that the trial court shall "designate the conservator who has the exclusive right to
determine the primary residence of the child" and "establish, until modified by further order,
a geographic area within which the conservator shall maintain the child's primary
residence[,] or specify that the conservator may determine the child's primary residence
without regard to geographic location[.]" Tex. Fam. Code Ann. § 153.134(b)(1)(A)(B)
(Vernon Supp. 2008). Because the trial court has wide latitude in determining the child's
best interest, we will reverse that decision only if the trial court has abused its discretion. 
Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982). In Lenz v. Lenz, the Texas Supreme
Court considered the following factors, among others, in applying the best-interest standard
in the relocation context: 

 (1) the reasons for and against the move;

 (2) the effect on extended family relationships; 

 (3) the effect on visitation and communication with the non-custodial parent
to maintain a full and continuous relationship with the child;

 (4) the possibility of a visitation schedule allowing the continuation of a
meaningful relationship between the non-custodial parent and child; and 

 (5) the nature of the child's existing contact with both parents, and the child's
age, community ties, and health and educational needs. 


Lenz v. Lenz, 79 S.W.3d 10, 15-17 (Tex. 2002); In the Interest of C.R.O., 96 S.W.3d 442,
448-49 (Tex. App.--Amarillo 2002, pet. denied). As the Supreme Court noted, suits affecting
the parent-child relationship require balancing numerous factors and are "intensely fact
driven." Id. at 19. The court considers the best interest of the child in determining issues of
conservatorship, possession of, and access to a child. Tex. Fam. Code Ann. § 153.002; see
also Stucki v. Stucki, 222 S.W.3d 116, 125 (Tex. App.--Tyler 2006, no pet.). 

 In findings of fact, the trial court stated K.S. lives and works in Lake Charles,
Louisiana, and is expected to stay there; that K.S. has family support in Lake Charles; and
that C.B. "has family residing in the area of Lake Charles, Louisiana, including an uncle and
grandmother living within a short distance from the residence of [K.S.]." Although C.B.
argues that the record shows there is no basis for these findings of fact, our review of the
record reveals there is evidence to support each one. The evidence presented by K.S. shows
she and the child were residing with K.S.'s grandmother in Lake Charles pending the
outcome of the litigation; K.S. had been looking for a two-bedroom home there. K.S. had
resided in Lake Charles with A.E.M.S. prior to the litigation and Lake Charles was the
child's birthplace. K.S. testified A.E.M.S. had an extended family of aunts, uncles, and
cousins in Lake Charles. K.S. and C.B. are to exchange the child at the Texas/Louisiana
state line. The restriction requiring K.S. to live within 100 miles of the Jefferson County
Courthouse allows the continuation of a meaningful relationship between C.B. and A.E.M.S. 
Considering the evidence in the record, and the "best interest" of the child standard, we
conclude the trial court did not abuse its discretion in restricting the residence to "within 100
miles of the Jefferson County Courthouse." We overrule issue three.

 In issue four, C.B. contends the award of $597 per month in child support is not
supported by the evidence. The trial court is accorded discretion in setting and modifying
child support payments; absent a clear abuse of discretion, the trial court's order will not be
disturbed on appeal. See generally Tex. Fam. Code Ann. § 156.402(b) (Vernon 2002);
Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990); McGuire v. McGuire, 4 S.W.3d 382,
387 (Tex.App.--Houston [1st Dist.] 1999, no pet.). C.B. argues the award, if any is necessary,
should have been $529.69. See Tex. Fam. Code Ann. §§ 154.061 (Vernon Supp. 2007),
154.129 (Vernon 2002). C.B.'s W-2 forms for 2005 and 2006 show gross annual incomes
of $56,022.07 and $52,214.36 respectively. C.B. testified there was the possibility of
overtime income, although the availability of it was unpredictable. Given C.B.'s testimony
concerning the possibility of overtime, the trial court could reasonably have concluded a
larger figure was warranted in making the child support calculations. We find no abuse of
discretion in the trial court's $597 monthly child support. Issue four is overruled.

 K.S.'s brief includes a request for damages and sanctions for what she argues is C.B.'s
frivolous appeal. She relies on rule 45 of the Texas Rules of Appellate Procedure. See Tex.
R. App. P. 45. K.S. offers no supporting authorities but does assert misconduct. See Tex. R.
App. P. 38.1(h), 38.2(a)(1). On the record presented however, we deny the request.

 We affirm the trial court's judgment.

 AFFIRMED.

 

 ____________________________

 DAVID GAULTNEY

 Justice

 

Submitted on July 30, 2008

Opinion Delivered October 9, 2008


Before McKeithen, C.J., Gaultney and Horton, JJ.

1. The trial court's agreed amended order states in one paragraph that K.S. shall have
the exclusive right to designate the child's primary residence within 100 miles of Jefferson
County. In another paragraph, the order states "within 100 miles of the Jefferson County
Courthouse, 1001 Pearl Street, Beaumont, Texas." Neither party argues the conflict makes
a difference in this appeal. 
2. C.B. asserts finding of fact number 47 mistakenly states C.B.'s name was on
A.E.M.S.'s birth certificate when, in fact, no father was listed on A.E.M.S.'s birth certificate.
However, finding 47 refers to the birth certificate of another child fathered by C.B. 
3. Title 5 if the Family Code is titled "The Parent-Child Relationship and the Suit
Affecting the Parent-Child Relationship" and includes Chapters 151-160.