**AFFIRM; and Opinion Filed May 20, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-12-00134-CV**

**IN THE INTEREST OF Z.R.P. AND D.A.P.**

**On Appeal from the 255th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 02-16453-S**

**MEMORANDUM OPINION**

Before Justices O'Neill, Francis, and Fillmore
Opinion by Justice O'Neill

This appeal involves the October 18, 2011 order in a Suit Affecting the Parent-Child Relationship. Rodney Purdue, the biological father of Z.R.P. and D.A.P., argues the trial court abused its discretion by determining it was in the best interest of the children to change primary custody with the right to designate residence from him to the children's maternal grandmother and step-grandfather. We affirm the trial court's order.

**Background**

Purdue and the children's biological mother never married. Z.R.P. was born in April 2000 and D.A.P. was born in June 2001. A petition to establish the parent-child relationship was filed on December 10, 2002, and the parents entered into an agreed order establishing the parent-child relationship on January 21, 2003. The order named the parents joint managing conservators and limited the children's domicile to Dallas County and the contiguous counties. The children resided primarily with their mother, and Purdue received standard possession.

Purdue entered the military in October 2004. He participated in basic training in Georgia, but later was stationed in Washington. He saw the children twice a year from October 2004 to April 2006.

The children's mother died in 2006. Because of Purdue's military obligations, the children lived with their maternal grandmother and step-grandfather for the next two years. Purdue saw the children briefly in December 2006, and they spent a week with him in Washington in December 2007.

Purdue left the military in 2008, and the trial court entered an order designating him as the children's conservator with the right to designate their residence within the geographical limitations of Dallas County and the contiguous counties. Because of difficulties finding employment, Purdue re-enlisted with the military in January 2011. He filed a petition to lift the domicile restriction because he wanted to move the children to Washington. The grandparents filed a counter-petition asking to be appointed conservators with the exclusive right to determine the children's residence.

The trial court conducted a hearing on October 5, 2011. At the time, Purdue had already moved to Washington, and the children were living with their step-mother at Purdue's sister's home in Garland.

The court heard testimony from Purdue, the children's counselor, the children's paternal aunt, the grandmother, and Diane Zilka, who performed the court-ordered social study. The trial court determined it was in the best interest of the children to not lift the geographic restriction and instead, changed the primary possession with the right to designate the children's residence from Purdue to the grandparents. This appeal followed.

**Standard of Review and Applicable Law**

We review a trial court's decision regarding child custody, control, possession and visitation under an abuse of discretion standard. *In re K.L.W.*, 301 S.W.3d 423, 424–25 (Tex. App.—Dallas 2009, no pet.). The trial court's judgment will only be disturbed where the record as a whole shows that the trial court abused its discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *In re K.L.W.*, 301 S.W.3d at 425. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or when it acts without reference to any guiding principles. *In re K.L.W.*, 301 S.W.3d at 425.

When the trial court appoints joint managing conservators, the court must designate the conservator who has the exclusive right to determine the primary residence of the child and must either establish a geographic area within which the conservator shall maintain the child's primary residency or specify that there are no geographic restrictions. TEX. FAM. CODE ANN. § 153.134(b)(1) (West 2008). In this case, the court ordered that "[Grandparents], as a nonparent joint managing conservator, shall have the following rights and duties: 1. The exclusive right to designate the primary residence of the children within Dallas and contiguous counties; . . . ."

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002 (West 2008). These types of cases are "intensely fact driven, which is why courts have developed best-interest tests that consider and balance numerous factors." *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002).

In the context of residency restrictions and authorization of relocation, the supreme court has instructed us to consider the public policies outlined in section 153.001(a), which provides that the public policy of this state is to (1) assure that children will have frequent and continuing contact with parents who have shown an ability to act in the best interest of the child; (2) provide

a safe, stable, and nonviolent environment for the child; and (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage. TEX. FAM. CODE ANN. § 153.001(a)(1)–(3) (West 2008).

There is a wide array of other factors that can be relevant to the determination of a child's best interest involving a parental relocation. These include the (1) reasons for and against the move, (2) education, health, and leisure opportunities afforded by the move, (3) accommodation of the child's special needs or talents, (4) effect of extended family relationships, (5) effect on visitation and communication with the noncustodial parent, (6) noncustodial parent's ability to relocate, and (7) the child's age. *Lenz*, 79 S.W.3d at 15–16. We may also consider the general factors relevant to the best interest of a child, such as (1) the child's desires, (2) the child's current and future physical and emotional needs, (3) any physical or emotional danger to the child in the present or future, (4) the parental abilities of the individuals involved, (5) the programs available to those individuals to promote the child's best interest, (6) the plans for the child by these individuals, (7) the stability of the home, (8) acts or omissions by a parent tending to show that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

**Discussion**

Purdue argues on appeal that the trial court disregarded the testimony of Cathleen Caballero, the children's counselor, and instead, relied solely on the social study and testimony of Diane Zilka, the family court counselor. He contends Caballero was in a better position to determine what was in the children's best interest because she spent over a year counseling them, whereas Zilka based her conclusions on "only six sessions, two of which included a limited number [of] interviews with the children."

During the hearing, Caballero testified that at the time she started counseling the children, they seemed to be confused and "had alot of difficulty adjusting in between the transitions between visits between houses." She expressed that the children feel they are put in the middle of what their father and grandmother want and this causes stress. She specifically stated, "The children have said that they want to live with the grandparents. That is something that they have said all along." When asked if she thought the children have a bonded and loving relationship with their father and step-mother, she said, "I think they are in the process of building it."

While she could not definitively say the children have a bonded relationship with him yet, she opined that allowing the children to remain in Texas with their grandparents "would negatively impact the children's ability to continue building their relationship with their father." She believed if the children were allowed to move with Purdue the relationship with the grandparents could be maintained, but the adults would need to put aside their personal conflicts.

After hearing Caballero's testimony, the trial judge did state, "[Caballero] wasn't in the position of doing an evaluation of what would be best for the kids; she was just presented with the situation at hand and she was helping the children deal with it." Caballero agreed with this statement.

While Purdue contends the trial court disregarded Caballero's testimony, the record reflects that the court thought that "probably" the opinion of a Family Court Services worker would be more relevant to the best interest determination. Thus, the record does not indicate the court disregarded Caballero's testimony. Regardless, her testimony does not completely weigh in Purdue's favor. She testified the children indicated they wanted to live with the grandparents and that the relationship with Purdue was still a work in progress.

The trial court also heard testimony from Diane Zilka, who performed the court-ordered social study in 2008 and 2011. Zilka's social study revealed some concerns about Purdue and

his wife's interaction with the children. Specifically, she noted that when Z.R.P. attended a session with Purdue and his wife there was minimal eye contact, and Z.R.P. did not acknowledge his father even though he had not seem him for some time. She described Z.R.P. as not being "particularly engaged." She described Purdue and his wife as having a "fairly flat affect" during the session. She noted this was different than her initial observation in 2008 when Purdue appeared to enjoy his time with the children more. This suggested Purdue's relationship with the children had become more tense since they moved in with him.

Zilka made similar observations during D.A.P.'s session. D.A.P. did not greet her father or step-mother and made infrequent eye contact. While she appeared to enjoy playing, she was not "particularly engaged."

Both children enjoyed the session with their grandmother and step-grandfather. They laughed and joked, particularly with the step-grandfather. Zilka reported both children appeared to have a close and comfortable relationship with the grandparents. Neither child said anything negative about them. Both children said that if given three wishes, their first wish would be to live with their grandparents.

The same, however, cannot be said about the children's statements regarding Purdue and his wife. Z.R.P. dislikes that his father is "mean." He said he is glad he knows Purdue but likes his grandparents' home better. He feels his grandparents are more understanding and helpful. While he did not report any specific incidents of abuse, he did share a time that he witnessed Purdue throw and kick a dog. When another relative intervened, Purdue challenged the relative to a fight.

D.A.P. said she likes that Purdue loves her, but dislikes his yelling. She also reported she does not like her step-mother's yelling and said the step-mother called her a bad name one time but she could not remember the name. She told Zilka if she "lived with her grandparents she

wouldn't get yelled at all the time." She said Purdue disciplines her by grounding her for weeks, and she is required to go to her room after school and stay there. While she admitted her grandparents sometimes ground her, it is only for one or two days.

Zilka expressed concerns about Purdue's methods of discipline. She did not believe his use of forced exercise, particularly sit-ups and push-ups, was appropriate because "the main point is that the children incur pain as punishment for behavior." She further noted that sending the children to their rooms for more than a week was "very isolating in nature," and sends the message their company is unwanted or burdening. She opined this was not likely to be productive or conducive to fostering close emotional attachments.

Based on her observations, Zilka concluded the following:

> Such a move is likely to have a significantly negative impact upon the children, whose only connection with their deceased mother are the maternal relatives, all of whom live in Texas. In fact, the father's relatives also reside in Texas. Should the father remain in the military, his residence is likely to continue to change. The children do not appear to have completely adjusted emotionally to living with the father, and changing their residence to another state does not appear likely to contribute positively towards that end.

She further stated, "Because the children's attachment to the grandparents appears to be the most secure, this evaluator must recommend that the grandparents provide the children's primary residence."

Purdue testified that he felt it was his duty as a father to nurture the children and "do the right thing," but he agreed he was still in the process of bonding with them. He admitted there were issues with communication and co-parenting with the grandparents. However, he testified that if the geographic restriction was lifted, he would allow the children to visit the grandparents three weeks in the summer, a week at Christmas, and alternating Thanksgiving and spring break. He also would encourage the use of email and Skype. Purdue also explained that his wife has a large extended family in Washington, and the children get along great with them.

–7–

The children's grandmother also testified. She told the court she believed Purdue had deceived them because he originally told them he was called back to active military duty and not that he voluntarily re-enlisted. She said it was a "red flag" when he said he was going back to Washington because she felt like it was always his intention to move and try and take the children. She said it had been very difficult to have continual contact with the children other than her visits and felt Purdue tried to limit her contacts with them. Like Purdue, she said if the children were allowed to stay with her in Texas she would make sure they had access to email and Skype to stay in touch with their father. She would do "anything that would make it feel better to them." She also explained that the children have a close relationship with their half-brother, who lives with the grandparents. It would be hard on all three if they were separated.

At the end of the hearing, the trial court changed primary possession of the children to the grandparents. Based on the record as a whole, we cannot conclude this was an abuse of discretion. While Purdue claimed his need to re-enlist in the military was for employment purposes, as the court noted, "signing up again with the military, which it's more likely than not that you would have to move, doesn't put the children's needs first." Because of the loss of their mother, "they are more fragile." Allowing the children to stay with the grandparents will allow continued contact with their other maternal relatives. Moreover, the grandparents represent the most stable environment, and the children expressed their desire to live with them. Also, according to Zilka's observations, the children were more at ease and enjoyed their time with the grandparents more than the time with Purdue and his wife. The children seemed somewhat disengaged and Purdue was less involved than the previous social study, which indicated the current living situation was causing tension. Likewise, the questionable discipline practices used by Purdue, his angry outburst towards the dog and a relative, and the children expressing that he is mean and often yells at them indicate the children's emotional needs are not being met.

Accordingly, the trial court did not act arbitrarily and abuse its discretion by determining it was in the children's best interest to change primary custody with the right to designate residence from Purdue to the grandparents.

**Conclusion**

The October 18, 2011 order is affirmed.

/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE

120134F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF Z.R.P. AND D.A.P.

No. 05-12-00134-CV

On Appeal from the 255th Judicial District Court, Dallas County, Texas
Trial Court Cause No. 02-16453-S.
Opinion delivered by Justice O'Neill,
Justices Francis and Fillmore participating.

In accordance with this Court's opinion of this date, the trial court's October 18, 2011 order is **AFFIRMED**.

It is **ORDERED** that Clint Wells and Laura Wells recover their costs of this appeal from Rodney Purdue.

Judgment entered this 20th day of May, 2013.

/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE