Rosemarie Klara LENZ, Petitioner,

v.

Heinrich Rudolph LENZ, Respondent.

No. 01–0232.

Supreme Court of Texas.

Argued Jan. 9, 2002.

Decided June 6, 2002.

Richard R. Orsinger, San Antonio, for Petitioner.

Hector E. Mendez, San Antonio, for Petitioner.

Jo Chris G. Lopez, Shaddox Compere Walraven & Good, San Antonio, for Respondent.

Christine Tharp, San Antonio, for Respondent.

Justice HANKINSON delivered the opinion of the Court.

Today we decide issues of first impression under the Family Code concerning a primary custodial parent's right to modify a joint managing conservatorship to remove a residency restriction when that parent desires to relocate. Rosemarie (Romy) Lenz sued to modify the joint managing conservatorship she shared with her ex-husband, Rudolph (Rudi) Lenz, in order to relocate to Germany with their two sons. Contrary to a jury's verdict in favor of the modification, the trial court entered an order restricting the boys' residence to Bexar County, Texas, and further ordered each party responsible for its own attorney's fees and costs. The court of appeals affirmed. 40 S.W.3d 111. The precise issues presented for our review are: (1) whether Romy produced legally sufficient evidence to support the jury's verdict; and (2) if she did, whether Texas Family Code § 105.002 permits a trial court to impose a geographic restriction on a child's primary residence contrary to that verdict. We conclude that legally sufficient evidence supports the jury's verdict in favor of the requested modification, and that under Family Code § 105.002, the

trial court could not contravene the jury's verdict giving Romy the exclusive right to establish her sons' primary residence by imposing a geographical restriction on their primary residence. For these reasons, we reverse the court of appeals' judgment and render judgment modifying the joint managing conservatorship to give Romy the exclusive right to determine her sons' primary residence. We remand the issue of attorney's fees to the trial court for further proceedings consistent with this opinion.

Romy and Rudi Lenz are German citizens currently residing in San Antonio, Texas. Six years after their marriage in Germany, they had their first son, Oliver, in 1986. The family relocated to Phoenix, Arizona, in 1991 because of Rudi's job. The next year, Dominic was born. In 1997, Romy and Rudi legally separated and entered into a Stipulated Consent Decree of Legal Separation pursuant to Arizona law. The decree included a Joint Custody Agreement and Parenting Plan, under which Romy and Rudy would be joint legal custodians. The agreement designated Romy as the "primary residential parent," and as a result, Oliver and Dominic resided with their mother while Rudi saw the boys on a regular schedule. The agreement also expressed the parties' intent to relocate to San Antonio and restrict the boys' residency to Texas. Rudi moved to San Antonio in February 1997 to start a new job, and Romy and the boys followed in June of that year.

In January 1998, Romy initiated divorce proceedings in Bexar County, and eight months later, Romy and Rudi divorced. The divorce decree incorporated the Arizona Joint Custody Agreement and Parenting Plan. Thus, the children continued to live with their mother, their father saw them on the prearranged schedule, and Romy had the right to determine the boys' residence in Texas.

Shortly after the divorce, Romy filed this proceeding seeking to modify the divorce decree in order to remove the Texas residency restriction. She sought modification so she could return to Germany with the children and remarry. Rudi argued against Romy's modification and alternatively sought modification to become the boys' primary custodial joint managing conservator. Both parties sought attorney's fees and costs.

The modification issues were tried to a jury, while the trial court decided attorney's fees and costs. The court charged the jury with two questions: (1) whether the statutory requirements for modification had been proven; and (2) if so, which parent should have the exclusive right to determine the county of residence and primary residence of the children. The jury answered the first question affirmatively, and based on that answer, determined in response to the second question that Romy should have the exclusive right to determine the children's residence.

Rudi consequently filed a motion for judgment notwithstanding the verdict in which he asked the court to disregard the jury's verdict because, among other things, Romy had failed to produce sufficient evidence to meet any of the statutory requirements for modification under Texas Family Code § 156.202. *See* Tex. Fam.Code § 156.202.[1] Rudi also argued that the jury's finding giving Romy the exclusive

---

1. The Legislature repealed section 156.202 and amended the provisions relating to modification in its last legislative session. Act of May 22, 2001, 77th Leg., R.S., ch. 1289, §§ 5, 12, 2001 Tex. Gen. Laws 3108, 3111. The grounds for modification are now found in section 156.101, and no longer include the requirement of "positive improvement." *See id.* As the parties do not urge otherwise, we refer to the former provision for clarity.

right to determine the children's primary residence was advisory under Family Code § 105.002(c)(2)(B) because it concerned "a specific term or condition of possession of or access to the child," an issue on which a party is not entitled to a jury finding under the statute. *See id.* § 105.002(c)(2)(B). In the alternative, Rudi asked the court to enter orders in the best interest of the children and specify a fixed geographical area in which the children could reside.

Although the jury found in favor of modification and gave Romy the exclusive right to determine the children's primary residence, in its final order the trial court allowed Romy to establish the children's primary residence, but only within Bexar County. The trial court also ordered each party to pay its own attorney's fees and costs. The court of appeals affirmed, concluding that no evidence showed that the boys' relocation would be a positive improvement and in their best interest, and that Family Code § 153.134 authorized the trial court to impose the additional residency restriction. 40 S.W.3d at 116–18.

Romy presents two issues for our review: (1) whether legally sufficient evidence supports the jury's finding that her children's relocation to Germany would be a positive improvement for them and in their best interest, thereby justifying modification of the joint managing conservatorship, *see* TEX. FAM.CODE § 156.202(2); and (2) whether the trial court had the authority to impose an additional residency restriction contrary to the jury's verdict, *see id.* § 105.002.

As a preliminary matter, Romy asserts that Rudi did not preserve his legal-sufficiency challenge to the modification finding because the record failed to reflect the trial court's ruling on his motion for judgment notwithstanding the verdict. Rudi, however, argues that Romy had the burden to preserve error, because as the ap-

pealing party she should have secured a ruling on the motion and had that ruling reflected in the record. We conclude that Rudi has preserved error.

■ Rudi's motion asked the court to disregard the jury's finding on modification, or in the alternative, to render an order specifying a fixed geographical area for the children's residence. The trial court's final order declared:

> Pursuant to the jury's verdict, IT IS ORDERED ... Article V of the Joint Custody Agreement and Parenting Plan entitled "Relocation" ... is hereby specifically modified to read as follows: ... as a condition of possession to the joint managing conservatorship, that the children shall reside in and attend school in Bexar County, Texas.

Thus, although the trial court ordered modification "pursuant to the jury's verdict," it imposed its own primary residence restriction. By doing this, the trial court rejected the jury's verdict giving Romy the exclusive right to decide her sons' primary residence and granted the alternative remedy Rudi sought in his motion, which was to restrict the children's primary residence to Bexar County. In this way, the trial court implicitly disposed of the motion for judgment notwithstanding the verdict. *See* TEX.R.APP. P. 33.1(a)(2)(A) (stating record must show that trial court "ruled on the request, objection, or motion, either expressly or implicitly").

■ As Rudi did not waive his no-evidence challenge, we turn to Romy's claim that the court of appeals erred in sustaining that challenge. When reviewing a no-evidence point, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001). Here, we must decide wheth-

er Romy presented more than a scintilla of evidence to support modifying the joint managing conservatorship to remove the residency restriction so that she could relocate with her children.

■ Family Code § 156.202 specifies that a court may modify the terms and conditions of a joint managing conservatorship when two requirements are met. First, either the circumstances of the child or one or both of the conservators must have materially and substantially changed since the rendition of the order, or the order must have become unworkable or inappropriate under existing circumstances. TEX. FAM.CODE § 156.202(1). Second, the modification must be a positive improvement for and in the best interest of the child. *Id.* § 156.202(2). The parties do not dispute that Romy's circumstances have materially and substantially changed since the divorce and that the order has become unworkable under the parties' present circumstances. *See id.* § 156.202(1). The parties also acknowledge Romy's wish to move to Germany and remarry. At issue is the second part of the test for modification—whether relocation will be a positive improvement for and in the best interest of Oliver and Dominic. *See id.* § 156.202(2).

The Legislature has made clear that "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM.CODE § 153.002. Yet, the Family Code does not elaborate on the specific requirements for modification in the residency-restriction context, and we have no specific statute governing residency restrictions or their removal for purposes of relocation. Neither have Texas courts articulated any specific standards to apply in this context. Nonetheless, the Legislature has provided a basic frame-work upon which we may build guidelines for reviewing a modification that removes a residency restriction for purposes of relocation. Family Code § 153.001 outlines this framework by pronouncing our public policy for all suits affecting the parent-child relationship:

(a) The public policy of this state is to:

(1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;

(2) provide a safe, stable, and nonviolent environment for the child; and

(3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

*Id.* § 153.001(a). We must endeavor to give meaning to these public policy imperatives as we interpret the Family Code modification standards in the relocation context. But as this is an issue of first impression for our Court, we begin by reviewing the jurisprudence of other states that have outlined standards in the relocation context.

Several jurisdictions have enumerated considerations at issue when a primary custodial parent seeks to relocate. *See, e.g., In re Marriage of Burgess,* 13 Cal.4th 25, 51 Cal.Rptr.2d 444, 913 P.2d 473 (1996); *In re Marriage of Smith,* 172 Ill.2d 312, 216 Ill.Dec. 652, 665 N.E.2d 1209 (1996); *Silbaugh v. Silbaugh,* 543 N.W.2d 639 (Minn.1996); *Wilson v. Wilson,* 58 S.W.3d 718 (Tenn.Ct.App.2001); *Baures v. Lewis,* 167 N.J. 91, 770 A.2d 214 (2001); *Tropea v. Tropea,* 87 N.Y.2d 727, 642 N.Y.S.2d 575, 665 N.E.2d 145 (1996); *Love v. Love,* 851 P.2d 1283 (Wyo.1993). Historically, courts have disfavored removing a child from the jurisdiction issuing the original custody decree. Edwin J. Terry et al., *Relocation: Moving Forward or Moving Backward?,* 31 TEX. TECH. L.REV. 983, 986 (2000). Re-

cently, however, courts have reassessed the standards for relocation, moving away from a relatively strict presumption against relocation and toward a more fluid balancing test that permits the trial court to take into account a greater number of relevant factors. *See, e.g., Burgess,* 51 Cal.Rptr.2d 444, 913 P.2d at 481; *In re Marriage of Francis,* 919 P.2d 776, 784 (Colo.1996); *Baures,* 770 A.2d at 224; *Tropea,* 642 N.Y.S.2d 575, 665 N.E.2d at 151. Increasing geographic mobility and the availability of easier, faster, and cheaper communication have in part accounted for this shift in perspective. *See Baures,* 770 A.2d at 217, 222. The change in approach to evaluating relocation standards is best highlighted by three cases: *Baures v. Lewis,* 167 N.J. 91, 770 A.2d 214 (2001), *Tropea v. Tropea,* 87 N.Y.2d 727, 642 N.Y.S.2d 575, 665 N.E.2d 145 (1996), and *In re Marriage of Burgess,* 13 Cal.4th 25, 51 Cal.Rptr.2d 444, 913 P.2d 473 (1996).

*Baures* constitutes the latest case in New Jersey's evolving jurisprudence on removal. In *Baures,* the court held that under the New Jersey removal statute, a custodial parent may move with the children as long as the move does not interfere with the best interests of the children or the visitation rights of the noncustodial parent. *Baures,* 770 A.2d at 227. Guided by two previous New Jersey Supreme Court cases, *Holder v. Polanski,* 111 N.J. 344, 544 A.2d 852 (1988), and *Cooper v. Cooper,* 99 N.J. 42, 491 A.2d 606 (1984), the court clarified the legal standards for removal in *Baures. Baures,* 770 A.2d at 217. The court had previously required that the custodial parent seeking relocation to another state prove a "real advantage" to that parent from the move, but then in *Holder* rejected that requirement as failing to allow custodial parents the same freedom enjoyed by noncustodial parents to seek a better life. *Holder,* 544 A.2d at 856; *see Baures,* 770 A.2d at 227.

The court then established a new two-part test requiring a good-faith reason for the move and proof the child will not suffer from it. *Holder,* 544 A.2d at 856; *see* Baures, 770 A.2d at 230. In *Baures,* the court listed many factors relevant to proving the two parts, including, among other things: the reasons for and against the move; comparison of education, health, and leisure opportunities; whether special needs or talents of the children can be accommodated; the effect on extended family relationships; the effect on visitation and communication with the noncustodial parent to maintain a full and continuous relationship with the child; and whether the noncustodial parent has the ability to relocate. *Baures* 770 A.2d at 229–30.

In *Tropea,* New York, long considered one of the most restrictive jurisdictions with respect to relocation, replaced a test requiring the parent seeking relocation to prove "exceptional circumstances" to justify the move with one focusing on the best interests of the child: "[W]e hold that each relocation request must be considered on its own merits with due consideration of all the relevant facts and circumstances and with predominant emphasis being placed on what outcome is most likely to serve the best interests of the child." *Tropea,* 642 N.Y.S.2d 575, 665 N.E.2d at 149–50; *see* Terry, *supra,* at 987. Recognizing that its earlier test erected artificial barriers to viewing all relevant factors for relocation, the court then identified factors for the trial court to consider, including the parents' good faith in requesting or opposing the move, the possibility of a visitation schedule allowing the continuation of a meaningful relationship between the noncustodial parent and the child, the degree of economic, emotional, and education enhancement for the custodial parent and the child, and the effect on extended family

relationships. *Tropea*, 642 N.Y.S.2d 575, 665 N.E.2d at 149–51. The court opined that to summarily reject motives for relocation "overlooks the value for children that strengthening and stabilizing the new, postdivorce family unit can have in a particular case." *Id.* at 151.

Finally, in *Burgess*, the California Supreme Court also modified its prior approach of requiring a custodial parent to prove that relocation was "necessary" before permitting the move. *Burgess*, 51 Cal.Rptr.2d 444, 913 P.2d at 480–81. The court concluded that the necessity of relocating "has little, if any, substantive bearing on the suitability of a parent to retain the role of a custodial parent." *Id.* Moreover, the court noted that given that both parents may need to secure or retain employment or pursue educational or career opportunities, "it is unrealistic to assume that divorced parents will permanently remain in the same location after dissolution or to exert pressure on them to do so." *Id.* at 480–81. Of paramount concern in the best-interest analysis, however, was the need for continuity and stability in custody arrangements. *Id.* Like Texas, the California Family Code pronounced a public policy in favor of "frequent and [continuing] contact" between the parents and children. *Id.* at 480 (quoting CAL. FAM.CODE § 3020); *see* TEX. FAM.CODE § 153.001(a)(1). The court in *Burgess* held "[t]he policy of Family Code section 3020 in favor of 'frequent and [continuing] contact' does not so constrain the trial court's broad discretion to determine, in light of *all* the circumstances, what custody arrangements serve the 'best interest' of minor children." *Burgess*, 51 Cal.Rptr.2d 444, 913 P.2d at 480. And, as did .the courts in *Baures* and *Tropea*, the court pointed out that "bright line rules in this area are inappropriate: each case must be evaluated on its own unique facts," and identified factors to consider, such as the

nature of the child's existing contact with both parents, the child's age, community ties, and health and educational needs. *Id.* at 483.

Other jurisdictions are also part of this shift toward less stringent relocation standards. *See Francis*, 919 P.2d at 784 ("[T]he child's best interests are served by preserving the custodial relationship, by avoiding relitigation of custody decisions, and by recognizing the close link between the best interests of the custodial parent and the best interests of the child."); *Stout v. Stout*, 560 N.W.2d 903, 913 (N.D.1997) (clarifying interpretation of relocation statute to permit removal in the best interests of the child); *Love*, 851 P.2d at 1289 (concluding that as long as the custodial parent seeks the move in good faith and reasonable visitation is available to the noncustodial parent, removal should be granted).

As most of these cases rely on a best-interest standard as the ultimate guide for determining whether a modification for purposes of relocation should be granted, the factors they consider reflect the public policy concerns implicit in Texas' own statutory best-interest standard for modification. *See* TEX. FAM.CODE § 156.202(2) (modification must be "a positive improvement for and in the best interest of the child"). The factors highlighted by those courts thus may assist us in giving meaning to our best-interest standard in the relocation context, particularly in light of the Legislature's overarching goals of assuring that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child and to provide a safe, stable, and nonviolent environment for the child. *See id.* § 153.001(a).

■ Contrary to the courts highlighted above, however, we are reviewing not a trial court's determination after that judge

has balanced the relevant factors, but the decision of a jury. *See id.* § 105.002(c)(1)(D) (a party may demand a jury trial on the issue of primary residence). Thus our analytical framework is different, even though much of the evidence will be of the same kind a trial court in another jurisdiction might take into account. In this case, we must conduct a legal-sufficiency review to determine whether the evidence supports the jury's verdict in favor of removing a residency restriction. Therefore, we view the evidence produced relevant to the best-interest factors in a light that tends to support the jury's verdict. *See Bradford,* 48 S.W.3d at 754. With these considerations in mind, we turn to our legal-sufficiency review.

Oliver is a German citizen and resident alien of the United States; Dominic has dual citizenship. Both boys speak German in their mother's home, as well as receive formal training in German from a tutor. They also watch German movies and listen to taped stories in German. The children celebrate German and American holidays. At trial, a clinical and forensic psychiatrist, Dr. Frank Paredes, testified that maintaining the boys' German culture was very important because their cultural identity acted as a mechanism by which to deal with life events. Moreover, Dr. Paredes averred that it is "terribly important for these children to maintain and benefit from their culture of origin, the German culture." Oliver and Dominic also have strong family ties in Germany. Almost all the Lenzes' extended family live in Germany, including the boys' only living grandparents with whom they have a close relationship. Rudi testified that his sons are also close to Romy's sister and brother-in-law as well as her fiancé, Harmut Graffert. In addition to family members, Oliver and Dominic have good friends in Germany. The boys' strong association with their German heritage and culture, and the opportunity to strengthen their relationships with extended family members amount to some evidence that the boys may benefit by moving to Germany. *See Landa v. Landa,* 539 So.2d 543, 544 (Fla.Dist.Ct. App.1989) (noting that opportunity to live in Chile with family members would be beneficial to children); *Yannas v. Frondistou–Yannas,* 395 Mass. 704, 481 N.E.2d 1153, 1155–56 (1985) (concluding that children should benefit from move to Greece by strengthening their ties to family and Greek culture); *see also Tropea,* 642 N.Y.S.2d 575, 665 N.E.2d at 151 (stating courts should consider effect on extended family relationships). That same evidence also indicates the boys will live in a stable and supportive environment. *See* Tex. Fam.Code § 153.001(a)(2) (declaring that the public policy of this state is to "provide a safe, stable, and nonviolent environment for the child").

Romy's improved financial situation in Germany may also contribute to her providing a better standard of living for her two sons. Romy testified that she searched for employment in San Antonio, applying for travel agent positions, but found only part-time work as an outside travel agent earning six dollars an hour and working twelve hours a week. Clinical psychologist Dr. Joann Murphey testified that Romy felt she was more employable in Germany than San Antonio. While Romy's agreed-upon spousal support will cease if she remarries, there is evidence that Romy's fiancé will help support her sons financially. That Romy has a chance of better employment and a stable financial situation in Germany is evidence that she may provide a higher standard of living for her sons there. *See Yannas,* 481 N.E.2d at 1156 (taking into consideration mother's much improved professional and financial situation in Greece versus unem-

ployment in Massachusetts); *see also Burgess,* 51 Cal.Rptr.2d 444, 913 P.2d at 480 (recognizing need of parent to secure employment or pursue career opportunities); *Tropea,* 642 N.Y.S.2d 575, 665 N.E.2d at 151 (looking at degree of economic enhancement from the move).

The record also contains testimony that relocation would positively affect Romy's emotional and mental state, with beneficial results for Oliver and Dominic. Dr. Murphey testified that Romy feels lonely in San Antonio. Dr. Murphey then stated that if Romy is happier in Germany, natural benefits would flow to her children. The psychologist commented that the custodial parent's mental state directly impacts the quality of a child's life. Because the custodial parent provides the child with a basic quality of life, a child's best interest is closely intertwined with the well-being of the custodial parent. *See Francis,* 919 P.2d at 784; *Yannas,* 481 N.E.2d at 1157–58; *Baures,* 770 A.2d at 224; *Cooper,* 491 A.2d at 612, *modified by Holder,* 544 A.2d at 856. Of course, the child's best interest trumps that of either parent; however, to disavow the custodial parent's influence on his or her children ignores the fundamental relationship between parent and child.

■ Rudi's right to have regular and meaningful contact is also an important factor in the best-interest analysis. *See* TEX. FAM.CODE § 153.001(a)(1) (declaring that state's public policy is to assure that child will have continuing contact with parents who can act in child's best interest). The record shows, however, that while Romy will experience a personal life and financial prospects that are less satisfactory should she remain in San Antonio, Rudi could easily relocate to Germany in order to be with his sons. Besides being a native German, Rudi has many employment options in Germany. Dr. Murphey testi-

fied that Rudi told her he could return to his former employer in Germany, albeit resulting in a demotion. With respect to other job prospects, Rudi testified that he received many calls from German headhunters even though he did not circulate his resume. He also told Romy he could move back to Germany and perform his job from there. Furthermore, Rudi has an advanced German business degree. Rudi's ability to move to Germany is some evidence that Romy's relocating the boys to Germany would not necessarily result in diminished contact between Rudi and the boys. In certain situations, as here, a jury may consider evidence of the possibility and feasibility of a parallel move by a committed noncustodial parent as an alternative to restricting the custodial parent's mobility. *See Tropea,* 642 N.Y.S.2d 575, 665 N.E.2d at 151; *see Rampolla v. Rampolla,* 269 N.J.Super. 300, 635 A.2d 539, 543 (1993).

The evidence also shows that even if Rudi chose not to return to Germany, he can adapt his work schedule to be with his children. During the summer of 1998, Rudi planned meetings in Germany to coincide with Romy's visit there with the children. Rudi also testified that in his job, he has the freedom to change his schedule. Moreover, Romy testified that if Rudi decided to stay in Texas, he could see Oliver and Dominic every vacation they have and when Rudi is in Germany. That Rudi has the ability to continue visitation in Germany allows Romy and Rudi to continue sharing the rights and duties of raising their two children. *See* TEX. FAM.CODE § 153.001(a)(3) (declaring that state's public policy is to "encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage").

The Legislature's expressed public policy considerations guide our analysis of the

positive-improvement and best-interest standard in the relocation context, but no bright-line test can be formulated. Suits affecting the parent-child relationship are intensely fact driven, which is why courts have developed best-interest tests that consider and balance numerous factors. *See Burgess,* 51 Cal.Rptr.2d 444, 913 P.2d at 483 ("[E]ach case must be evaluated on its own unique facts."); *Yannas,* 481 N.E.2d at 1158 ("Unless one is to apply a fixed but arbitrary rule, the issue can be resolved only on a case by case basis."); *Cooper,* 491 A.2d at 614 ("Because they are fact-sensitive, no two cases are the same and it is therefore essential that the trial court have the flexibility to deal with unforeseen fact patterns."). Given the many relevant factors, courts have explicitly rejected formulaic tests in relocation cases. *See Burgess,* 51 Cal.Rptr.2d 444, 913 P.2d at 483 ("[W]e recognize bright-line rules in this area are inappropriate."); *Tropea,* 642 N.Y.S.2d 575, 665 N.E.2d at 149–50 (rejecting three-tiered exceptional circumstances test).

■ In this case, we conclude that Romy produced evidence that Oliver and Dominic have strong ethnic and cultural ties to Germany, maintain strong relationships with their extended family in Germany, will benefit from Romy's increased well-being living in Germany, and can still maintain frequent contact with their father while there. This evidence is more than a scintilla, and thus is legally sufficient to support the jury's verdict for Romy. To be sure, Rudi offered evidence suggesting that relocating the boys to Germany would not be a positive improvement for them or in their best interest. He points to his close relationship with his sons, their friendships in San Antonio, expert testimony favoring their stay in Texas, and his willingness to increase financial support to Romy to enable her to remain in San

Antonio. We emphasize, however, that under a legal-sufficiency review, we must disregard all evidence and inferences contrary to the jury's finding. *Bradford,* 48 S.W.3d at 754. Therefore, viewing the evidence in a light tending to support the jury's verdict, we conclude that more than a scintilla of evidence exists to uphold the jury's verdict in favor of Romy's requested modification of the joint managing conservatorship.

■ We now turn to the question of whether the trial court had the authority to further modify the joint managing conservatorship itself by restricting the boys' primary residence to Bexar County. Romy argues that the trial court violated Texas Family Code § 105.002(d), which prohibits a trial court from contravening a jury's verdict on certain specified issues, including the determination of a child's primary residence. *See* Tex. Fam.Code §§ 105.002(d), 105.002(c)(1)(D). Rudi responds that determining primary residence is a "right or duty of a conservator," and thus the jury's finding was merely advisory under Family Code § 105.002(c)(2)(C), and the trial court was free to make its own determination. Rudi also contends that former Family Code § 153.134(b), which governs court-ordered joint conservatorships, authorized the trial court to impose an additional geographical restriction. We agree with Romy.

■ We begin by examining Family Code § 105.002, which addresses the jury's role in suits affecting the parent-child relationship. When construing a statute, we ascertain the Legislature's intent from the plain meaning of the actual language used. *In re American Homestar of Lancaster, Inc.,* 50 S.W.3d 480, 486–87 (Tex.2001); *American Home Prods. Corp. v. Clark,* 38 S.W.3d 92, 95–96 (Tex.2000); *see* Tex. Gov't Code § 311.011(a). Section 105.002(c)(1) states that "a party is entitled

to a verdict by the jury on the [issue] of: ... (D) the determination of the primary residence of the child." TEX. FAM.CODE § 105.002(c)(1)(D). Section 105.002(c)(2) then excludes the issue of primary residence from the list of those conservatorship issues reserved to the trial court: "a party is not entitled to a jury verdict on the [issue] of: ... (C) any right or duty of a possessory or managing conservator, other than the issue of primary residence." *Id.* § 105.002(c)(2)(C). Finally, section 105.002(d) restricts the trial court's power to "contravene a jury verdict" on the issue of primary residence. *Id.* § 105.002(d); *see id.* § 105.002(c)(1). Therefore, Romy is correct that the statute's plain language means that she was entitled to a jury verdict in this case, and the trial court was not authorized to contravene that verdict by imposing an additional geographical restriction.

This conclusion is further supported by the history of the prior version of section 105.002 (formerly Family Code § 11.13). *See* TEX. GOV'T CODE § 311.023; *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001). Before 1997, section 105.002 permitted a court to "submit or refuse to submit issues to the jury as the court determines appropriate," including the issues of the "specific terms and conditions of possession of and access to the child, support of the child, and the rights, privileges, duties, and powers of ... joint managing conservators." Act of April 26, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 131, *amended by* Act of May 8, 1997, 75th Leg., R.S., ch. 180, § 1, 1997 Tex. Gen. Laws 1033, 1034. If such an issue were submitted to the jury, the verdict was "advisory only." *Id.*

In *Martin v. Martin,* 776 S.W.2d 572, 574 (Tex.1989), we decided that under this earlier version of section 105.002, a trial court's decree could contravene the jury's

verdict on the specific terms and conditions of access to the child, including primary residence. Confusion arose, however, over the relationship between binding jury verdicts on custody, *see* TEX. FAM. CODE § 105.002, and court-determined conservatorship terms. *See* JOHN J. SAMPSON ET AL., SAMPSON & TINDALL'S TEXAS FAMILY CODE ANNOTATED § 105.002 cmt. (11th ed.2001). That is, when a jury awarded joint managing conservatorship as the custody arrangement, it was unclear whether the child's primary residence should be considered a term of the conservatorship, an issue determined by the trial court. *See id.* If so, the trial court had the authority to designate the child's primary residence. *See id.* The possibility that such authority would ultimately thwart the jury's will in determining custody raised concern. *See id.;* HOUSE COMM. ON JUVENILE JUSTICE & FAMILY ISSUES, BILL ANALYSIS, Tex. H.B. 646, 75th Leg., R.S. (1997).

Because of this concern, the Legislature amended section 105.002 in 1997 to clarify which issues a jury may decide in a suit affecting the parent-child relationship. Act of May 8, 1997, 75th Leg., R.S., ch. 180, § 1, 1997 Tex. Gen. Laws 1033, 1034. The amended statute, current section 105.002, distinguishes binding jury findings from advisory ones. *Id.* In doing so, the Legislature specifically included primary residence on the list of issues for which a jury's verdict is binding. *Id.* Thus, because we have concluded that there is legally sufficient evidence to support the jury's verdict in this case, we further conclude that the trial court improperly contravened the jury's verdict by imposing a geographic restriction on the boys' primary residence.

■ Rudi further argues that the trial court's restriction was authorized by Fami- -

ly Code § 153.134.[2] We disagree. Section 153.134 requires a court to include certain provisions in its order appointing joint managing conservators. TEX. FAM.CODE § 153.134(b). One of those essential provisions concerns residence: the order must either establish the county of the child's residence or designate the conservator who has the exclusive right to determine the child's primary residence. *Id.* § 153.134(b)(1). That the order must include a residence provision, however, does not affect a party's right to have the primary residence issue determined by a jury. *See id.* § 105.002. Section 153.134 required the trial court to include a residence provision in its order, but in this case that provision had to be in accord with the jury's verdict giving Romy the exclusive right to determine her children's primary residence.

Finally, as we reverse the court of appeals' judgment and render judgment giving Romy the exclusive right to determine her children's primary residence, the only issue left on remand is that of Romy's attorney's fees. An attorney's fees award in a suit affecting the parent-child relationship is discretionary with the trial court. *See* TEX. FAM.CODE § 106.002. In light of our decision today, the trial court should have an opportunity to reconsider the attorney's fees award. *See Bruni v. Bruni,* 924 S.W.2d 366, 368–69 (Tex.1996).

Because we conclude legally sufficient evidence supports the jury's verdict in favor of modification and the trial court erred in imposing a geographical restriction on the children's primary residence in contravention of that verdict, we reverse the court of appeals' judgment, render judgment modifying the joint managing conservatorship to give Rosemarie Lenz the exclusive right to establish her children's primary residence in accordance with the jury's verdict, and remand the attorney's fees issue to the trial court for further proceedings consistent with this opinion.