

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00395-CV

**IN THE INTEREST OF C.M.**, a Child

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2004-CI-13517
Honorable Dick Alcala, Judge Presiding

Opinion by:     Patricia O. Alvarez, Justice

Sitting:        Catherine Stone, Chief Justice
                Marialyn Barnard, Justice
                Patricia O. Alvarez, Justice

Delivered and Filed:  May 14, 2014

AFFIRMED

Appellant Henry Magallanes and Appellee Lori Rios-Altman are joint managing conservators of their minor child, C.M. The case stems from Rios-Altman's petition seeking to have the geographic restriction lifted in order to allow her to move with C.M. to Georgia. The trial court granted the petition and this appeal ensued. We affirm the trial court's judgment.

### FACTUAL BACKGROUND

#### A.    The Divorce

On December 16, 2005, a final divorce decree was signed in this matter providing Magallanes and Rios-Altman joint managing conservators of C.M. At the time, C.M. was almost four-years old. Rios-Altman was named the parent having the exclusive right to establish the primary residence of the child within Bexar County, Texas. The divorce decree contained a

standard geographic restriction requiring the decree be modified prior to changing the primary residence from Bexar County.

**B.      Motion to Modify the Parent-Child Relationship Filed**

In 2011, Rios-Altman married Daniel Altman, an old high school friend from Georgia, and began making arrangements to move C.M. to Georgia.  On August 2, 2011, Magallanes filed a petition to modify the parent-child relationship seeking to be appointed as the parent with the exclusive right to designate the primary residence of C.M., or in the alternative, that the terms and conditions for access of C.M. be modified to provide Magallanes with an expanded standard possession order and Rios-Altman be enjoined from removing C.M. from Bexar County.  In response, Rios-Altman filed a counter-petition seeking to have the geographic restriction lifted in order to allow her to move with C.M. to Georgia.  On August 12, 2011, the trial court issued a temporary restraining order preventing Rios-Altman from removing C.M. from Bexar County until a final order could be issued.  The court also ordered a social study be conducted.

Ann Matthews, a licensed therapist, conducted the social study.  The study was submitted to the court on November 28, 2011.  In such, Matthews concluded that "the child's best interest [would be] served by [Rios-Altman] remaining the parent with the exclusive right to designate the child's residence and the geographic restriction being modified to include the Augusta, Georgia area."  The report also provided that Magallanes "should [have] significant parenting time as allowed over one hundred miles, and frequent phone calls and internet access to the child."

**C.      The Hearing**

The matter was called for a hearing on June 25, 2012.  C.M., then ten-years old, did not testify.  The trial court heard testimony from Magallanes, Rios-Altman, the father of Rios-Altman's four-year-old child, and Matthews.  Because much of Magallanes's argument is based on Matthew's testimony, a more detailed description of her testimony and report is warranted.

Matthews testified that she met with each parent twice and Mr. Altman once. She described Magallanes as controlling and manipulative and expressed concern that he personally reported being at Rios-Altman's residence where he was looking in the windows to check on C.M. Matthews also confirmed that Magallanes (1) requested several police escorts for visitation drop-off and pick-up of C.M., (2) requested a police officer conduct a welfare check on C.M. late at night, and (3) was in an altercation with a third-party at the Rios-Altman residence. These events were magnified by Magallanes's apparent lack of understanding of the emotional impact these events were having on C.M.

With regard to visitation, Matthews also voiced concerns. Prior to filing the suit, Matthews testified that Magallanes only saw C.M. when it was convenient for him. Magallanes explained that "he used the mother as child care when he was unable. So if he needed to work, for example, on a weekend that was supposed to be his parenting time, he either picked her up late or picked her up and kept her for a while and then returned her." Matthews reiterated that Magallanes was not consistently exercising his parental visitation until the case was filed and she expressed concern about his continued visitation in the future. Matthews also expressed concerns about the communication between Magallanes and Rios-Altman, which even resulted in C.M. being left at school when Magallanes did not pick her up for visitation.

As to C.M.'s education, Matthews indicated that Magallanes appeared to exaggerate his influence on C.M.'s education. Matthews confirmed that C.M. was doing very well in school, but could not attribute the same to Magallanes's involvement prior to this matter being filed. In terms of future communication, Matthews opined that a strong bond could be maintained between C.M. and Magallanes. She based her opinion on C.M. being very verbal and Matthews's belief that C.M. could communicate well via Skype or other video-conferencing methods. Although

Matthews did not believe Rios-Altman would hinder C.M.'s ability to communicate with Magallanes, she did recommend that a "coparenting facilitator" would be beneficial for the parents.

As to emotional enhancement, Matthews confirmed that Rios-Altman is from the Georgia area, her family is there, and her new spouse and his extended family live in the area. As such, Matthews opined the move would be more stable for Rios-Altman and, thus, a better situation for C.M. When questioned about the fact that Rios-Altman was no longer employed, Matthews explained that even without current employment, there were legitimate reasons to lift the geographic restriction. Specifically, Matthews highlighted Rios-Altman moving to join a spouse or moving to join or rejoin extended family. Magallanes's attorney posed numerous hypotheticals and the factual changes to the information known to Matthews at the time of her report. On cross-examination, Matthews conceded that, without further information, she could not testify as to whether she would make any changes to her report.

## D.     The Trial Court's Order

At the close of the testimony, the trial court ordered the geographic restriction be lifted. The court continued:

> The court has considered the emotional well-being of the custodial parent, that it would—that the custodial parent that is emotionally well is good for the child, that there's strong family ties in Georgia that have been maintained, relationships with grandparents and other extended family in that state.

> The court finds that—from the evidence that there would be economic stability for the child that would be enhanced. Educational stability, it would be basically about the same.

> The court finds that based on the evidence that there will be—the child will be able to maintain frequent contact with the father.

The court further found that "lifting the restriction would positively affect [C.M.], [and] enhance the child's emotional and mental well-being." The court expressed concerns about C.M. being present when police were called and Magallanes's lack of boundaries at the Rios-Altman

residence. The court explained that Magallanes's actions clearly affected C.M. and that "[i]f the child were to move, that's not likely to occur again."

Magallanes's emergency motion to stay the trial court's order was denied on June 26, 2012, and this appeal ensued.

### BEST INTERESTS OF THE CHILD

Magallanes contends the trial court erred in determining that Rios-Altman demonstrated that her move to Georgia was not only in the best interest of the child, but that the move would *positively impact* C.M. educationally, emotionally, and economically. We address Magallanes's claim under the factors relevant to the determination of whether a geographic restriction is in the best interest of the child and public policy.

### A. Standard of Review

Once a trial court appoints joint managing conservators and designates the parent who has the exclusive right to determine the primary residence of the child, it then has the discretion to either establish a geographic area in which the child may reside or specify that there are no geographic restrictions. *See* TEX. FAM. CODE ANN. § 153.134(b)(1) (West 2014) (providing the court shall "establish, until modified by further order, a geographic area within which the conservator shall maintain the child's primary residence").

Trial courts have wide discretion in determining the best interests of the child, and their judgments will be reversed on appeal only for an abuse of discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *accord In re T.M.P.*, 417 S.W.3d 557, 562 (Tex. App.—El Paso 2013, no pet.). "We must be cognizant that the trial court is in a better position to decide custody cases because 'it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent.'" *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.) (quoting *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—

Austin 2005, pet. denied)); *accord Maixner v. Maixner*, 641 S.W.2d 374, 376 (Tex. App.—Dallas 1982, no writ). Appellate courts have long recognized that a trial court is in a much better position to make such determinations. *Maixner*, 641 S.W.2d at 376.

**B.      Best Interests of the Child Under Texas Family Code Section 153.002**

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002 (West 2014); *accord Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002). In *Lenz v. Lenz*, the Texas Supreme Court provided a variety of factors relevant to the determination of whether a geographic restriction is in the best interest of the child, including: (1) the reasons for and against the move, including the parents' good faith motives in requesting or opposing it; (2) health, education, and leisure opportunities; (3) the degree of economic, emotional, and educational enhancement for the custodial parent and child; (4) the effect on extended family relationships; (5) accommodation of the child's special needs or talents; (6) the effect on visitation and communication with the non-custodial parent to maintain a full and continuous relationship with the child; (7) the possibility of a visitation schedule allowing the continuation of a meaningful relationship between the non-custodial parent and child; and (8) the ability of the non-custodial parent to relocate. *Lenz*, 79 S.W.3d at 14–16; *see also In re W.C.B.*, 337 S.W.3d 510, 514 (Tex. App.—Dallas 2011, no pet.). The decision to determine if relocation is permitted is fact-driven. *Lenz*, 79 S.W.3d at 18–19.

*1.      Requirement to Show Positive Impact*

The basis of Magallanes's argument is Rios-Altman's failure to prove that lifting the geographic restriction would have a *positive impact* on C.M. educationally, emotionally, or financially. Specifically, Magallanes contends that (1) C.M.'s educational needs are being well met at the school she is attending, (2) Bexar County is the only place C.M. has ever known with

C.M.'s friends, school, and Magallanes's extended family, and (3) Rios-Altman plans to move into a single-income household supporting four children and two adults.

In support of his argument, Magallanes relies on *In re C.R.O.*, 96 S.W.3d 442, 447–48 (Tex. App.—Amarillo 2002, pet. denied), for the proposition that Rios-Altman must make an affirmative showing of a "positive improvement" before the geographic restriction can be lifted. The court in *In re C.R.O.* relied on Family Code section 156.202's requirement that the movant on a motion to modify show the modification would be a positive improvement for the child. *Id.*

We note, however, the 2001 Legislature repealed section 156.202 and amended the provisions relating to modification. Act of May 22, 2001, 77th Leg., R.S., ch. 1289, §§ 5, 12, 2001 Tex. Gen. Laws 3108, 3111. The grounds for modification are now found in section 156.101, and no longer include the requirement of a "positive improvement." TEX. FAM. CODE ANN. § 156.101(a) ("The court may modify an order . . . that provides for the possession of or access to a child if modification would be in the best interest of the child"); *see also Lenz*, 79 S.W.3d at 12 n. 1; *In re V.L.K.*, 24 S.W.3d 338, 342 (Tex. 2000). We, therefore, conduct our analysis under the current version of section 156.101.

2.    *Best Interest of the Child*

Among other witnesses, the trial court heard testimony from both parents and the psychologist assigned to perform the social study. The testimony supported a conclusion that C.M. was a bright child and her school opportunities in Georgia should not affect her educational well-being. As to the financial stability of the Rios-Altman residence, the evidence substantiated that, although Rios-Altman did not currently have a job in Georgia, the move would increase the economic stability for C.M. Mr. Altman had a steady job and there was nothing to suggest that once Rios-Altman was in Georgia, she would not be gainfully employed.

As to C.M.'s emotional improvement, the court recognized that a happy environment for Rios-Altman would likely result in a happy environment for C.M. Although Magallanes's extended family is located in Bexar County, moving to Georgia would open new and stronger ties with Rios-Altman's extended family. The court also opined that the distance would hopefully limit some of Magallanes's behaviors, including calling the police and peering into the windows at Rios-Altman's residence.

Although Magallanes points this court to the inconsistencies in the testimony, the trial court listened to the testimony, observed the witnesses, and evaluated their demeanor. *See In re M.M.M.*, 307 S.W.3d at 849. Based on the record before us, we cannot say they trial court abused its discretion in determining the *Lenz* factors weighed in favor of lifting the geographic restriction. *See Lenz*, 79 S.W.3d at 14–16.

## C.    Public Policy Concerns Under Texas Family Code Section 153.001(1)

Magallanes next contends that public policy dictates against allowing Rios-Altman to move C.M. one-thousand miles away from her father, to a location where Magallanes cannot continue to share the rights and duties of raising C.M. in the same manner as if he was in the same city, much less the same state.

In reviewing determinations regarding modification of residency restrictions to permit a custodial parent's relocation, we look to the public policy set forth in the Family Code and the guidelines developed based upon that policy. *See In re Cooper*, 333 S.W.3d 656, 660 (Tex. App.—Dallas 2009, orig. proceeding); *accord Lenz*, 79 S.W.3d at 14 ("The Legislature has provided a basic framework upon which we may build guidelines for reviewing a modification that removes a residency restriction for purposes of relocation."). Public policy highly recommends encouraging separated and divorced parents to share in both the rights and duties of raising a child. *In re Cooper*, 333 S.W.3d at 660.

*1.    Public Policy Concerns*

Section 153.001 of the Texas Family Code provides factors for the court to use in evaluating whether lifting the geographic restriction violates Texas public policy.  Specifically, section 153.001(a) requires to the court to

(1)    assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;
(2)    provide a safe, stable, and nonviolent environment for the child; and
(3)    encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

TEX. FAM. CODE ANN. § 153.001(a).  "Such policy concerns weigh heavily in assessing whether to modify geographic restrictions placed on the child's residence." *In re C.M.G.*, 339 S.W.3d 317, 320 (Tex. App.—Amarillo 2001, no pet.).

*2.    Application to C.M.*

a)    Frequent and Continuing Contact

Here, the trial court concluded that C.M. would be able to maintain frequent contact with Magallanes.   The testimony supported that Rios-Altman would not interfere in their communication, that Magallanes calls C.M. regularly and Rios-Altman had never intervened in the past, that travel was readily available from Georgia to Bexar County, and that C.M. was very articulate and capable of using Skype or another form of video-conferencing to communicate with her father.

b)    Safe, Stable, and Nonviolent Environment

The testimony also supported the trial court's conclusion that Rios-Altman would be able to provide C.M. a stable environment in Georgia.  Rios-Altman had a long work history before losing her current job in San Antonio and her husband has stable employment.  Rios-Altman's extended family and support system are in Georgia.  Additionally, Matthews explained that in addition to her own family, Rios-Altman would have Altman's extended family for support.

Although C.M.'s life experiences had been limited to her friends at her elementary school and the family she had known in Bexar County, Matthews opined that Georgia would only provide additional and deeper support for both Rios-Altman and C.M.

Additionally, the trial court considered Magallanes's own actions as weighing against Bexar County as a safe and stable environment. By his own account, he called the police on several occasions without any recognition as to the effect such actions would have on C.M. Matthews also testified that she believed Magallanes was manipulative. Prior to bringing this action, Magallanes had little regular contact with C.M., and when he did, it was only on his terms.

c)     Encourage Parents to Share Rights and Duties

During her testimony, Matthews explained that she recommended using a "coparenting facilitator" to assist the parents in working together. Matthews further opined that Magallanes exaggerated his influence over C.M. and his involvement in previous parental rights and duties. In fact, Matthews even proffered that Magallanes's interest in C.M. was directly tied to this suit and could easily wane when the matter was resolved.

*3.     Best Interests*

We cannot say the trial court abused its discretion in determining that public policy supported lifting the geographic restriction and allowing Rios-Altman to move with C.M. to Georgia. *See Lenz*, 79 S.W.3d at 14–16.

## CONCLUSION

For the reasons stated above, we affirm the trial court's judgment.

Patricia O. Alvarez, Justice