

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-24-00453-CV

Christopher **HUGHES**,
Appellant

v.

Christina **HUGHES**,
Appellee

From the 216th Judicial District Court, Kerr County, Texas
Trial Court No. 22823A
Honorable Albert D. Pattillo, III, Judge Presiding

Opinion by:  Adrian A. Spears II, Justice

Sitting:  Rebeca C. Martinez, Chief Justice
Irene Rios, Justice
Adrian A. Spears II, Justice

Delivered and Filed: July 23, 2025

AFFIRMED

After a bench trial, the trial court signed a final decree of divorce appointing Christina Hughes and Christopher Hughes as joint managing conservators of their two young children, E.L.H. and G.L.H. The decree designated Christina as the joint managing conservator with the exclusive right to determine the children's primary residence without geographic restriction. On appeal, Christopher argues the trial court abused its discretion by not imposing a geographic restriction on the children's primary residence. We affirm.

## BACKGROUND

Christina and Christopher were married on October 17, 2015. Their first child, E.L.H., was born in 2018. On December 4, 2022, Christopher told Christina he wanted a divorce and the couple separated. At the time, Christina was twenty-three weeks pregnant with G.L.H., who was not born until March 2023. Christina filed a petition for divorce on December 20, 2022, and Christopher filed a counterpetition on February 2, 2023.

Before the separation, Christina was a stay-at-home parent, and Christopher supported the family financially by working as a traveling nurse. Christopher was working and staying in Dallas, Texas, while Christina and E.L.H. were living in the marital home in Kerrville, Texas. Christina and E.L.H. would sometimes visit Christopher in Dallas, and Christopher would sometimes come home to Kerrville to visit Christina and E.L.H. After the separation, Christopher continued to work and live in Dallas. Meanwhile, Christina, E.L.H., and G.L.H. lived in the marital home in Kerrville, Texas.

On June 20, 2023, the trial court held an evidentiary hearing and rendered temporary orders. Both parents were appointed temporary joint managing conservators of the children. Christina was designated the temporary joint managing conservator with the exclusive right to determine the children's primary residence with a geographic restriction limited to Kerr County and the contiguous counties. Christopher was ordered to pay $1,500.00 per month in temporary child support in accordance with the child support guidelines and $1,000.00 per month in temporary spousal support. Because Christopher resided more than one hundred miles from E.L.H., Christopher was given the right to possession of four-year-old E.L.H. for one weekend per month. Because G.L.H. was only three months old, Christopher was not given the right to overnight possession of G.L.H.; however, Christopher and Christina were ordered to work in good

faith with a parent facilitator to establish an increasing or "stair step" schedule for Christopher to have possession and access to G.L.H.

Final trial on the merits was held on March 18, 2024. At trial, Christina testified that since the separation she and the children had experienced financial difficulties. Christopher had failed to make multiple mortgage payments on the marital home and the home's water was shut off due to nonpayment. Christina's father had helped Christina and the children by making the mortgage payments for several months and buying necessary items for the children. After the marital home was sold, Christina and the children went to live with friends. By the time of trial, Christina was employed at a daycare center in Kerrville, where she was earning $13.75 an hour. Christina's employer offered her a fifty-percent reduction on childcare, which helped her pay for E.L.H.'s daycare.

Christina explained that she was contemplating a move to Lexington, South Carolina, so she could earn a better living and better support the children. Christina had an aunt who lived in Lexington, and the aunt owned a large house with extra bedrooms and a one-bedroom, one-bath cottage on the property. The aunt, with whom Christina had a close relationship, had invited Christina and the children to come live with her rent free. The aunt had also offered to provide childcare for the children while Christina was at work. The aunt's home was in a top school district. After researching the issue, Christina felt that her economic opportunities were better in Lexington than in Kerr County. Christina, who had a bachelor's degree in science and public health, had already applied for two jobs in South Carolina. One of these jobs was an early interventionist/case manager, a field in which Christina had seven years' experience. Both jobs would pay Christina more than she was making at her current job, increasing her annual salary by about $20,000 a year.

Christina testified that even if she and the children were allowed to relocate to South Carolina, the children would be able to maintain a relationship with Christopher. Christina presented evidence showing that two airlines offered roundtrip airfares between Dallas, Texas, and Charlotte, North Carolina for $123.00 or less. Christina believed that she and Christopher could afford this airfare and that it would be feasible for the children to have in-person visits with him. Additionally, Christina said that if they were allowed to move to South Carolina, she and the children would still return to Texas for visits with family and friends, which would provide additional opportunities for Christopher and the children to visit in person. Christina added that the children had daily electronic communications with Christopher, and they would continue to do so. Finally, Christina testified she had researched nursing jobs in South Carolina and the salary for these jobs was commensurate with the salary Christopher was now earning in Dallas.

Christina's father, David Mauk, testified that after the couple separated, Christina and the children struggled without Christopher's consistent financial support. During this time, Mauk had helped Christina and the children by making $7,976.08 in mortgage payments on the marital home and providing $18,800.24 in other economic support for Christina and the children. Christina's friends had also helped Christina and the children during this difficult time. After the marital home was sold, some of her friends had welcomed Christina and the children into their home. In Mauk's opinion, Christopher's lack of support made it hard for Christina and the children to thrive in Kerrville. Even though it pained him to say so, Mauk felt that the economic and educational opportunities for Christina and the children were better in South Carolina than in Kerrville. Mauk was afraid that if Christina and the children continued to live in Kerrville, they would wind up economically disadvantaged.

Christopher testified that by the time of trial he was $9,000.00 in arrears on temporary child and spousal support, but he also said that on the morning of trial he paid $3,000.00 toward this arrearage. According to Christopher, these arrearages accrued because in addition to the temporary child and spousal support he had other bills to pay such as his rent, insurance, and cell phone bills. Christopher also mentioned that he had lost his job and was out of work for a month. Christopher acknowledged that after he and Christina separated, he made numerous discretionary purchases, including the purchase of a motorcycle. Christopher was currently living with his girlfriend in her home, where he paid for part of the cost of housing and groceries.

Christopher further testified that—if it was best for the children—he would be willing to move back to another city in the Texas Hill Country, but he would not move back to Kerrville. Christopher did not feel he could work and live in Kerrville, expressing frustration about the gossip circulating in the small community and calling it "a toxic environment." Christopher acknowledged that he had chosen to live in Dallas, even if it meant not being near his children. Christopher objected to Christina and the children moving to South Carolina. Christopher felt that it was more convenient for him to visit the children if Christina and the children were required to stay in Kerr County. Christopher said he was not interested in relocating to South Carolina.

Christopher's parents and most of his siblings lived in Kerrville. However, Christopher preferred to visit with E.L.H. at his girlfriend's home in Dallas, Texas, rather than visiting with E.L.H. in Kerrville. Christopher stated that the trip between Dallas and Kerrville takes him only three and a half to four hours each way. Apart from mentioning that his side of the family did not have any time to interact with the children except for during his own visitation times, Christopher did not elaborate on the relationship the children had with his side of the family.

Finally, parenting facilitator, Carrie Beaird, testified that she had met with Christina and Christopher nine times. She and the parties had struggled with establishing a "parenting plan" for the youngest child, G.L.H. However, the month before trial, Christopher had visited with G.L.H. for eight consecutive hours, and the parties had agreed that the following month Christopher's visits with G.L.H. would increase to ten hours. Beaird stated that based upon her understanding of the court's temporary orders for possession and access, Christopher was able to exercise all his possession and access to the children. Beaird also explained that the daily electronic communications between Christopher and the children had been complicated by Christopher's varying work schedule. Beaird had to explain to Christina and Christopher that they needed to be flexible and communicative with each other so the electronic communications could take place at alternative times. Beaird believed that the parties' problems with the electronic communications had been handled by the time of trial.

At the conclusion of the trial, Christina asked the trial court to refrain from imposing a geographic restriction on the children's primary residence because she wanted the flexibility to move to South Carolina, where she had extended family, free housing and childcare, and job opportunities. Christopher opposed this request, urging the trial court to restrict the children's primary residence to Kerr County. The amicus attorney, Sara Neel, recommended that no geographic restriction be imposed. In making her recommendation, Neel stated: "[Christopher] has the ability to move. [He] had the ability to move this entire time to be with his [children] and not force [Christina] into this situation she is in where she cannot provide for her children."

The trial court granted Christina the exclusive right to determine the children's primary residence without imposing a geographic restriction. *See* TEX. FAM. CODE § 153.134(b)(1)(B). In making its ruling, the trial court stated that it had "consider[ed] the evidence before the Court at

today's hearing, as well as prior hearings, and [] the various *Lenz*[1] factors and the testimony of the witnesses in this hearing, in particular the traveling nature and ability of the father to relocate, as he's done, and taking into consideration the fact that since the filing of this action the father has changed his county of residency away from [Kerr County]."

Christopher appealed. Findings of fact and conclusions of law were not requested or filed.

## STANDARD OF REVIEW AND APPLICABLE LAW

We review conservatorship orders for an abuse of discretion, reversing only if the trial court's decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court does not abuse its discretion if it bases its decision on conflicting evidence or if there is some evidence of substantive and probative value to support its decision. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). In conducting our review, we defer to the trial court's resolution of the underlying facts and its credibility determinations that may have affected its decision. *Mendez v. Delgado*, No. 04-18-00454-CV, 2019 WL 3208829, at \*5 (Tex. App.—San Antonio July 17, 2019, no pet.). When, as here, the trial court does not file findings of fact and conclusions of law, we imply that the trial court made all findings necessary to support the judgment and uphold those findings if supported by the evidence. *In re M.I.M.*, No. 04-22-00361-CV, 2023 WL 7552681, at \*2 (Tex. App.—San Antonio Nov. 15, 2023, no pet.).

The primary consideration of the court in determining issues of conservatorship and possession and access is the best interest of the children. TEX. FAM. CODE § 153.002. The court should also be guided by the public policy considerations identified in section 153.001 of the Texas Family Code: (1) assuring that children have frequent and continuing contact with parents who have shown an ability to act in the children's best interest; (2) providing a safe, stable, and

---

[1] *Lenz v. Lenz*, 79 S.W.3d 10, 15–16 (Tex. 2002).

nonviolent environment for the children; and (3) encouraging parents to share in the rights and duties of raising their children post-divorce. TEX. FAM. CODE § 153.001; *see In re M.V.*, 583 S.W.3d 354, 359–60 (Tex. App.—El Paso 2019, no pet.).

In *Lenz v. Lenz*, the Texas Supreme Court articulated numerous factors relevant to the determination of whether a geographic restriction is in the children's best interest: (1) the reasons for and against the move, including the parents' good faith motives in requesting or opposing it; (2) health, education, and leisure opportunities; (3) the degree of economic, emotional, and educational enhancement for the custodial parent and the children; (4) the effect on extended family relationships; (5) accommodation of the children's special needs or talents; (6) the effect on visitation and communication with the non-custodial parent to maintain a full and continuous relationship with the children; (7) the possibility of a visitation schedule allowing the continuation of a meaningful relationship between the non-custodial parent and the children; and (8) the ability of the non-custodial parent to relocate. 79 S.W.3d 10, 15–16 (Tex. 2002); *In re W.J.M.*, No. 04-20-00532-CV, 2022 WL 946636, at *5 (Tex. App.—San Antonio Mar. 30, 2022, no pet.). Decisions concerning geographic restrictions and the children's best interest are intensely fact driven. *See Lenz*, 79 S.W.3d at 19; *In re W.J.M.*, 2022 WL 946636, at *5.

### DISCUSSION

Christopher first argues that Christina's request for no geographic restriction on the children's primary residence was not made in good faith. According to Christopher, Christina's plan to move to South Carolina was motivated by her desire to prevent him from visiting the children. However, the evidence supported implied findings that Christina's request was motivated by a bona fide attempt to achieve financial security for herself and the children and that it was made in good faith. The evidence showed that since the separation, Christina's financial struggles

had been significant and that she and the children had relied on her father and her friends to meet their basic needs. The evidence also showed that by relocating to South Carolina, Christina would likely have an opportunity to overcome these financial struggles. Furthermore, the parent facilitator, Beaird, testified that Christopher was in fact able to exercise all his visitation with the children in accordance with the temporary orders. Finally, Christina testified that she had already demonstrated she would not block Christopher's possession and access to the children, and she would not block Christopher's possession and access to the children in the future. As the fact finder, the trial court was entitled to believe Christina's testimony on this issue. *See In re O.L.P.*, No. 04-23-00838-CV, 2025 WL 1452053, at *7 (Tex. App.—San Antonio May 21, 2025, no pet. h.) (recognizing trial court is the sole judge of witness credibility in a bench trial); *Mendez*, 2019 WL 3208829, at *5 (recognizing appellate court must defer to trial court's credibility determinations). Based on the evidence presented, the trial court could have reasonably concluded that not imposing a geographic restriction afforded Christina and the children a high degree of economic enhancement and, therefore, was in the children's best interest. *See Lenz*, 79 S.W.3d at 17 (highlighting evidence showing custodial parent "ha[d] a chance of better employment and a stable financial situation" if allowed to relocate, which "may provide a higher standard of living for her" children); *In re W.J.M.*, 2022 WL 946636, at *6 (affirming trial court's lifting of geographic restriction when "a refusal to lift the geographic would likely have caused Mother to remain under financial stress and have a negative impact on Mother's emotional state, which in turn could have a detrimental impact on the child"); *In re M.V.*, 583 S.W.3d at 363-64 (upholding trial court's decision to lift geographic restriction based on evidence supporting an inference that custodial parent's economic and financial outlook would improve if she and the children were permitted to relocate).

Christopher next argues that if Christina and the children do relocate to South Carolina it will be overly burdensome for him to visit the children. Christopher's right to have regular and meaningful contact with the children is an important factor in the best interest analysis. However, Christopher presented no details about the alleged burden the relocation placed on him. On the other hand, Christina presented evidence that if she and the children relocate to South Carolina, Christopher will still be able continue to have regular and meaningful contact with the children. Christina testified that in-person visits between Christopher and the children could be achieved by utilizing air travel and that the airfare was affordable for them. Plus, the evidence showed that when E.L.H. visits with Christopher for the weekend, the child spends a substantial amount of time—about ten hours—traveling in a car between Kerrville and Dallas and back again. The trial court could have inferred that if Christina and the children moved to South Carolina, E.L.H. would spend a comparable amount of time traveling to visit Christopher. Additionally, the evidence showed that Christina and the children planned to return to Kerrville for occasional visits with friends and family and these visits would provide additional opportunities for Christopher and the children to visit in person. Finally, the evidence showed that Christopher and the children engaged in daily electronic communications, which could certainly continue from South Carolina. Based on the evidence presented, the trial court could have reasonably concluded that the possibility existed for regular contact and a visitation schedule allowing for the continuation of a meaningful relationship between Christopher and the children.[2] *See In re M.V.*, 583 S.W.3d at 364 (upholding trial court's decision to lift geographic restriction when custodial parent "did come forward at the hearing with a plan to help ensure that [the child] would be able to maintain a meaningful and continuing relationship with [the noncustodial parent]").

---

[2]The decree essentially provides that once G.L.H. turns three years old, both children will be on the same visitation schedule with Christopher.

Christopher testified that he did not want to relocate to South Carolina, but the evidence showed it would be possible for him to find comparable employment and relocate to South Carolina to be close to his children. The evidence also showed that Christopher had accepted multiple nursing jobs outside of Texas in the past. Thus, the trial court could have reasonably concluded that Christopher had the ability to relocate to South Carolina. *See Lenz*, 79 S.W.3d at 18 (noting "[i]n certain situations" a factfinder "may consider evidence of the possibility and feasibility of a parallel move by a committed noncustodial parent as an alternative to restricting the custodial parent's mobility"); *In re D.L.N.*, 609 S.W.3d 237, 245–46 (Tex. App.—Texarkana 2020, no pet.) (affirming order awarding parent exclusive right to establish children's residence without geographic restriction when evidence showed that custodial parent wished to accept a new job out of state, and nothing showed noncustodial parent was unable to relocate to the same area).

Christopher further argues that the evidence showed that the educational, health, and leisure opportunities for the children were comparable in Texas and South Carolina. Although Christopher presented some evidence about the educational and health opportunities near his home in the Dallas area, he did not present any evidence about the educational and health opportunities in Kerrville, which was the relevant comparison for purposes of evaluating whether the children's primary residence should be restricted to Kerr County. On the other hand, Christina presented testimony that the educational system in Lexington was highly rated, and that if she and the children were permitted to move there, they would be surrounded by her extended family, including Christina's aunt and a multitude of cousins. The trial court could have reasonably concluded that these *Lenz* factors—educational opportunities and the presence of the children's extended family—weighed in favor of no geographic restriction. *See In re M.V.*, 583 S.W.3d at

364 (recognizing "the presence of family" and "the opportunity to cultivate [] new family relationships" as evidence supporting trial court's decision to lift geographic residency restriction).

After reviewing the evidence and considering the relevant *Lenz* factors and the best interest of the children, we conclude the trial court did not abuse its discretion by refusing to impose a geographic restriction on the children's primary residence.[3]

The final decree of divorce is affirmed.

Adrian A. Spears II, Justice

---

[3]Christopher also argues that section 153.004(b) of the Texas Family Code precluded the appointment of Christina as a joint managing conservator, but because he never presented this argument to the trial court it is not properly preserved for review on appeal. *See* TEX. R. APP. P. 33.1(a); *Martinez v. Martinez*, 157 S.W.3d 467, 471 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (concluding appellant waived complaint on appeal that the final divorce decree violated section 153.004 because "[n]o mention of any of the provisions in [s]ection 153.004 was made by either party in the court below"). However, even if Christopher had properly preserved this argument for our review, we would overrule it because the record is devoid of any evidence within the scope of section 153.004(b). *See* TEX. FAM. CODE 153.004(b) (precluding appointment of "joint managing conservators if credible evidence is presented of a history or pattern of past or present . . . physical or sexual abuse by one parent directed against the other parent").