

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

06-19-00090-CV

_____

IN THE INTEREST OF D.L.N., E.L.N., AND J.L.N., CHILDREN

On Appeal from the 76th District Court
Titus County, Texas
Trial Court No. 39,162

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Stevens

## OPINION

Father appeals the trial court's judgment in this suit modifying the relationship with his children, D.L.N., E.L.N., and J.L.N., and argues that the trial court abused its discretion by (1) awarding Mother child support in excess of statutory guidelines, (2) awarding Mother the exclusive right to establish the children's residence without geographical restriction, and (3) awarding Mother other exclusive rights, including the rights to consent to the children's health care needs, make decisions about their education, and maintain their passports.

We conclude that the record does not support Father's first point of error because it does not show that the trial court exceeded statutory guidelines when awarding child support. We also conclude that the trial court did not abuse its discretion in granting Mother the exclusive rights of which Father complains. As a result, we affirm the trial court's judgment.

## I.      Standard of Review

"We review the trial court's decision to modify conservatorship under an abuse of discretion standard." *In re P.M.G.*, 405 S.W.3d 406, 410 (Tex. App.—Texarkana 2013, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). "A trial court abuses its discretion only when it has acted in an unreasonable or arbitrary manner, or when it acts without reference to any guiding principle." *Id.* (quoting *In re Marriage of Jeffries*, 144 S.W.3d 636, 638 (Tex. App.—Texarkana 2004, no pet.) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985))). "Under this standard, legal and factual sufficiency are not independent grounds for asserting error, but are relevant factors in determining whether the trial court abused its discretion." *Id.* "In determining whether the trial court abused its discretion, we consider

2

whether the trial court had sufficient evidence upon which to exercise its discretion and, if so, whether it erred in the exercise of that discretion." *Id.*

"We consider only the evidence most favorable to the trial court's ruling and will uphold its judgment on any legal theory supported by the evidence." *Id.* (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)). "Where, as here, no findings of fact and conclusions of law are filed, it is 'implied that the trial court made all the findings necessary to support its judgment.'" *Id.* (quoting *Worford*, 801 S.W.2d at 109). "We are mindful that 'the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *Id.* (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). "We, therefore, defer to the trial court's judgment in matters involving factual resolutions and any credibility determinations that may have affected those resolutions." *Id.*

## II.     Factual Background

Mother filed a petition to modify the parent-child relationship because the trial court's prior split-custody arrangement had allegedly become unworkable. At trial, Mother explained that she wanted the exclusive right to designate the children's primary residence, without geographical restriction, because she had been offered a store manager position at a Burke's Outlet store in Monroe, Louisiana. The trial court also heard testimony about the nature of the relationship between Mother and Father, which ultimately led to the trial court's decision to grant Mother certain exclusive rights.

In October 2015, at time when Father was unemployed, Mother accepted a position at the Burke's Outlet store in Monroe, and informed Father that he was welcome to move with her and

the children who, at the time of trial, were ten, seven, and four years old. Father, Mother, and the children moved from Mount Pleasant, Texas, to Monroe, where they lived for several months. Mother testified that Father was unemployed the entire time that they were living in Monroe and that she supported the family, enrolled the children in school, and paid Father to watch his own children.

Mother said that she was never married to Father and refused his many proposals, and she characterized her relationship with him as abusive. Mother testified that Father held her down and instructed D.L.N. to hit her after she disciplined the child by taking his videogame. According to Mother, D.L.N. was not violent before this incident but engaged in fights at school after it. Mother also testified that, on a day when Father was late to pick up the children so she could go to work, Father pulled into the driveway as Mother drove off, he took D.L.N. and E.L.N. but left J.L.N. at home, and then caused Mother's arrest by calling the police to report that Mother had left the child.[1] After this incident, Mother testified that Father took Mother's green card and moved back to Mount Pleasant with the children without telling her where they lived. Father told Mother that he would take the children to Italy and threatened Mother with deportation if she did not consent. According to Mother, for seven months, Father forced her to sleep with him in a hotel room she had to pay for before she could see the children.

After some time, Mother transferred to the Texarkana Burke's store and moved there to be closer to the children and to exercise the alternating-week possession schedule. After a visit with Father, Mother discovered that E.L.N. had a hurt arm and told Father she was going to take the

---

[1]As a result of this incident, Mother pled guilty to and was convicted of child desertion.

child to the emergency room. Father told Mother not to take E.L.N. to the hospital and later called the police to report Mother for not taking the child, but Mother was already at the hospital when the police located her, and she was told that the child had dislocated his shoulder while in Father's care. Mother testified that Father taught the children to tell lies about a fake girlfriend to make her jealous.

Mother also described problems that she experienced with Father when attempting to care for the children's health and educational needs. Mother said that D.L.N. takes daily medication for seizures and that Father had refused to pick up his medication and failed to ensure that the child had healthcare even when ordered by the trial court to do so. Mother also introduced evidence showing that Father would not take J.L.N., who had eczema, to see a specialist because he wanted Mother to reschedule the appointment so she could take the child. She also testified that she took the children to dental appointments only to find that they were cancelled by Father. Mother also said she had located a daycare center that could provide for J.L.N.'s speech therapy and other developmental needs, but that Father refused to provide the child's social security card or his own personal information needed to complete the enrollment because he did not want J.L.N. to start day care. Mother said that, until trial, Father refused to tell her where he worked.

Mother testified that she wished to have the exclusive right to designate the children's primary residence because the store manager position in Monroe was waiting for her and because her longtime boyfriend of three years, Carlton, a corporate trainer with whom she had recently had another child, also lived in Monroe. Mother testified that the children enjoyed being in Monroe, attended a church there, and would have access to good schools and healthcare. At the time of

5

trial, Mother had to drive D.L.N. two hours away to see a neurologist, but she found a neurologist for him in Monroe.

Carlton testified about his relationship with the children and their relationship to the family he had in Monroe. Carlton testified that he and his family were available to help the children and that he had watched the children several times when Father or Father's family was unable to do so during Father's time of possession.[2] Carlton testified that Mother drove fifty minutes every day to Mount Pleasant while working and juggling day care, but that Father would often use deceptive ploys to sabotage provisions she would make for day care. Carlton supported Mother's petition for exclusive rights to designate the children's residence without geographical limitation.

Father testified that he moved back to Texas because Mother was abusive and had left J.L.N. at home alone. He admitted that he "ha[d] griped at [Mother] about setting up doctors' appointments on [his] week, because [he was] the one . . . always taking them [to] the doctors' appointments." He also said that he did not want to provide Mother with information needed to enroll J.L.N. in school because he did not want her to attend since she could not speak and would be unable to report any problems at school.

Father testified that he worked in the fracking industry as a sand coordinator for Halliburton, that his job moved with each assignment, and that he sometimes had to spend several days out of town before returning home, even on weeks when the children were supposed to be in his possession. Father testified that his mother or grandmother would watch the children when he was away from town for work.

---

[2]Carlton testified that Father had a habit of calling the police and had even called the police on him while he was watching the children.

Father was served with a subpoena requiring him to bring financial records and documentation of any income he had received for the last twelve months to trial, but the record showed that Father did not comply, and he brought only a few paycheck stubs with him. Father testified that he had dental insurance and had paid for medical insurance for the children through his employment, as reflected by the deductions on his paycheck. While Father previously agreed to provide for half of tutoring classes for one of the children, and was later ordered to do so, Father admitted that he failed to pay for the last month of tutoring. Father loved his children and believed it was in the children's best interests to remain with him.

After hearing this evidence, the trial court found that it was in the children's best interests for both parents to remain joint managing conservators with Mother having the "exclusive right to designate the primary residence of the children without regard to geographic location." The trial court also awarded Mother other exclusive rights including (1) the right to consent to medical, dental, and surgical treatment involving invasive procedures; (2) the right to consent to psychiatric and psychological treatment; (3) the right to represent the children in legal action; (4) the right to consent to marriage and enlistment in the armed forces; (5) the right to make decisions about the children's education; (6) the right to act as the children's agent; (7) the right to services and earnings of the children, except as provided by Section 264.0111 of the Texas Family Code; and (8) the right to apply for and maintain the children's passports. The trial court also ordered Father to pay $1,214.22 per month in child support and half of "[e]ducational and [m]iscellaneous [e]xpenses" that were to be "considered child support and enforceable as such."

7

## III.    The Record Does Not Support Father's First Point of Error

Father argues that the trial court abused its discretion by ordering him to pay child support in an amount greater than the statutory guidelines. While he agrees that the monthly amount of $1,214.22 in child support "was . . . in accordance with the guidelines," Father points to the order requiring him to pay educational and miscellaneous expenses[3] and argues that this shows that the trial court exceeded the statutory guidelines.[4] We disagree.

"The trial court is given broad discretion in setting child support payments and in modifying those payments." *In re W.C.R.*, No. 06-15-00001-CV, 2015 WL 3989149, at *2 (Tex. App.—Texarkana July 1, 2015, no pet.) (mem. op.) (quoting *In re K.R.L.*, No. 06-09-00010-CV, 2009 WL 1748965, at *2 (Tex. App.—Texarkana June 23, 2009, no pet.) (mem. op.)). "An appellate court should not disturb a child-support order unless a clear abuse of discretion is shown."

---

[3]The text of the order follows:

> In addition to all other . . . child support provisions provided in this order, the following is hereby ORDERED:
>
> 1.    Educational and Miscellaneous Expenses - [Mother] shall pay 50% and [Father] shall pay 50% of the cost of:
>
>> a.    All other expenses associated with school and/or extracurricular activities including: class trips, enrollment or registration fees, activity fees, and transportation associated with such activities.
>>
>> b.    [Mother] shall direct all receipts for costs incurred related to the expenses described above to [Father], who shall remit payment directly to [Mother] within 10 days of receipt.
>
> The provision of education and miscellaneous expenses will be considered child support and enforceable as such.

[4]The trial court also ordered Father to maintain health insurance for the children, but Father does not complain that this amount was in excess of child support, likely because (1) "[m]edical support is an additional child-support obligation that may be enforced by any means available for the enforcement of child support," and (2) the cost of the children's healthcare was already deducted from Father's paycheck. *In re A.L.S.*, 338 S.W.3d 59, 67 (Tex. App.— Houston [14th Dist.] 2011, pet. denied) (citing TEX. FAM. CODE ANN. § 154.183(a)).

8

*Id.* "[A]n obligation to pay a minor child's school tuition is necessarily an obligation to provide child support." *In re H.L.B.*, No. 05-18-01061-CV, 2020 WL 104623, at \*3 (Tex. App.—Dallas Jan. 9, 2020, no pet.) (mem. op.) (citing *In re Grossnickle*, 115 S.W.3d 238, 247 (Tex. App.—Texarkana 2003, no pet.); *Huffines v. McMahill*, No. 07-10-00029-CV, 2010 WL 2836980, at \*2 (Tex. App.—Amarillo July 20, 2010, no pet.) ("[T]he most common type of child support order is one that requires the parent who is not managing conservator to pay the managing conservator a sum of money on a periodic basis. But other types of support are authorized. Child support payments may include a specific expense, such as tuition.") (quotation marks omitted) (citations omitted)).

At trial, the trial court said, "Father will pay child support in accordance with the guidelines," and told Father,

> [I]t is possible that had you provided tax returns . . . and all of your paycheck stubs that the child support could be lower or higher than what's going to be ordered, but since you failed to comply with the subpoena duces tecum, it's going to be based solely on what you have provided . . . today.[5]

For purposes of determining child support, "[w]henever feasible, gross income should first be computed on an annual basis and then should be recalculated to determine average monthly gross income." TEX. FAM. CODE ANN. § 154.061(a). Among other things, the term "resources" includes 100% of all wage and salary income and other compensation for personal services, self-employment income, interest, dividends, royalties, annuities, capital gains, gifts, and prizes. Under the statutory guidelines, the trial court was to presumptively apply thirty percent of Father's monthly net resources as child support. TEX. FAM. CODE ANN. § 154.125 (Supp.).

---

[5]Our appellate record contains only one paycheck stub.

Father does not argue that the trial court lacked authority to order the payment of half of the children's educational and miscellaneous expenses. Instead, Father argues that the addition of this obligation caused his child support payments to exceed thirty percent of his monthly net resources. It is Father's burden to provide us with a record that supports his claimed error. *See Moore v. Hawkins*, No. 06-09-00076-CV, 2011 WL 907781, at *1 n.3 (Tex. App.—Texarkana Jan. 7, 2011, no pet.) (mem. op.). Since the record shows that Father failed to comply with the subpoena, Father cannot show that the amount he was ordered to pay exceeded thirty percent of his monthly net resources.

While our appellate record only contains one paycheck stub covering a two-week period listing gross pay at $2,179.00 and net pay at $1,633.70, it is apparent that Father brought a few other paycheck stubs with him to court that are not included in our appellate record. Father testified that his paychecks varied significantly for each pay period due to overtime pay and agreed that his latest paycheck for a two-week period listed his gross bi-monthly pay at $5,392.80 and his after-tax pay at $3,925.13. The only figures in the record seem to indicate that the order to pay child support of $1,214.22 was much less than the statutory guidelines for child support.

The record also fails to include any evidence of the cost of educational and miscellaneous expenses. Even so, the trial court stated that Father would pay child support in accordance with the guidelines. Because there were no findings of fact, we presume that the trial court considered the tutoring expenses and other educational and miscellaneous expenses when issuing its order and made an implied finding that all amounts of child support ordered were within the statutory guidelines. As a result, we conclude that the record does not support Father's first point of error.

10

**IV.     The Trial Court Did Not Abuse Its Discretion by Granting Mother Certain Exclusive Rights**

"The Texas Family Code sets forth 'significant hurdles' before a conservatorship order may be modified." *P.M.G.*, 405 S.W.3d at 411 (quoting *A.L.E.*, 279 S.W.3d at 428). "A court may modify a conservatorship order. . . . if modification would be in the best interest of the child' and 'the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed' since the date of the rendition of the [last order]." *Id.* (quoting TEX. FAM. CODE ANN. § 156.101(a)(1)(A)).

Father argues that the trial court's grant of certain exclusive rights to Mother was an abuse of discretion because (1) there was not a material and substantial change in circumstances since the trial court's last order in December 2016 and (2) Mother's award of these exclusive rights was not in the children's best interests. We disagree.

**A.     Right to Designate Primary Residence Without Geographical Restriction**

In his second point of error, Father complains of the trial court's award to Mother of the exclusive right to designate the children's primary residence without geographical limitation. If a trial court appoints both parties as joint managing conservators, "it must designate the conservator who has the exclusive right to determine the primary residence of the child and must either establish a geographic area within which the conservator shall maintain the child's primary residence or specify that there are no geographic restrictions." *Matter of Marriage of Christensen*, 570 S.W.3d 933, 938 (Tex. App.—Texarkana 2019, no pet.) (citing TEX. FAM. CODE ANN. § 153.134(b)(1)). "[T]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id.*

11

(quoting TEX. FAM. CODE ANN. § 153.002). "The trial court has wide latitude in determining what is in the best interest of the child." *Id.* (citing *Gillespie*, 644 S.W.2d at 451).

Furthermore, these types of cases are "intensely fact driven, which is why courts have developed best-interest tests that consider and balance numerous factors." *Id.* (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002)). "The Texas Supreme Court has instructed courts to consider the public policies outlined in Section 153.001(a) of the Texas Family Code." *Id.* (citing *Lenz*, 79 S.W.3d at 14). That Section specifies that the public policy of Texas is to

> (1)　　assure that children will have frequent and continuing contact with parents who have shown an ability to act in the best interest of the child;
>
> (2)　　provide a safe, stable, and nonviolent environment for the child; and
>
> (3)　　encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

TEX. FAM. CODE ANN. § 153.001(a)(1)–(3).

> A court may consider the following *Holley* factors relevant to a best-interest finding:
>
> (1) the child's desires, (2) the child's current and future physical and emotional needs, (3) any physical or emotional danger to the child in the present and the future, (4) the parental abilities of the individuals involved, (5) the programs available to those individuals to promote the child's best interest, (6) the plans for the child by the individuals, (7) the stability of the home, (8) acts or omissions by a parent tending to show that the existing parent-child relationship is inappropriate, and (9) any excuses for the acts or omissions of a parent.

*Christensen*, 570 S.W.3d 938 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). In *Lenz*, the Texas Supreme Court set out the following additional factors that may be relevant to the determination of a child's best interest when considering a parental relocation:

> (1) the reasons for and against the move, (2) the education, health, and leisure opportunities afforded by the move, (3) the accommodation of the child's special needs or talents, (4) the effect on extended family relationships, (5) the effect on

12

visitation and communication with the noncustodial parent, (6) the noncustodial parent's ability to relocate, and (7) the child's age.

*Id.* (citing *Lenz*, 79 S.W.3d at 15–16).

Here, the trial court heard that Mother wished to accept a store manager position in Louisiana, which would afford her a good opportunity to provide for her children. She had also had a child with Carlton, who lived in Louisiana, and wished to reunite D.L.N., E.L.N., and J.L.N. with their sibling. Mother provided the children with a safe and stable home and showed that she had resources in Monroe to ensure that the children had adequate care while she was working. Although Father established that the children had a good support system in Mount Pleasant, a place where they had lived for a majority of their lives, the trial court found that Father was not able to watch the children during his periods of possession. The trial court explained its reasoning in omitting a geographical restriction as follows:

> The Supreme Court has held -- and so have the cases that followed it -- that it is in the children's best interest that whenever possible they be raised by a parent.
>
> And I know, [Father], that you are doing the best that you can, that you have a lot of obligations with your job, but it appears to the Court that the children are being primarily raised by your mother and grandmother and you whenever your job allows it.[6]

Also, the children were young and both D.L.N. and J.L.N. had medical needs. J.L.N. was also behind developmentally and needed speech therapy. Mother explained the many difficulties she had experienced with Father who had secreted the children from her at times and refused to cooperate with Mother's efforts to provide the children with medical care and schooling. Though

---

[6]Mother testified that she paid Father's mother and grandmother to watch the children when she was working until Father forbade his family fom caring for the children during Mother's period of possession.

13

there were programs to assist J.L.N. with her developmental needs, Father had refused to allow Mother to enroll the child in school so she could take advantage of those programs. Mother also testified that Father was abusive toward her and had taught D.L.N. to fight. Mother testified that the children enjoyed the time spent living in Monroe, which had good schools and better healthcare, especially for D.L.N. Based on this evidence, the trial court was free to determine that the move to Monroe would afford the children better healthcare, education, and supervision.

In considering public policies outlined in the Texas Family Code, the trial court ensured that the children would have frequent and continuing contact with Father through a standard order for possession of and access to the children. As a result, and when considering Father's work schedule, the trial court could have found that the modified order would have minimal effect on extended family relationships and visitation and communication with Father. Also, nothing showed that Father, who often drove several hours for work out of town, would be unable to relocate closer to Monroe. Given the terms of the modified order, the trial court could have found that it would encourage both parents to share in the rights and duties of raising the children.

In sum, the facts showed that the circumstances of the parties had materially and substantially changed since December 2016 and that the trial court's prior order had become unworkable. Mother had another child and wished to relocate to accept a job offer while Father had accepted a position that did not enable him to personally care for the children during his periods of possession under the trial court's prior order. When considering the *Lenz* factors, *Holley* factors, and the public policies of the Texas Family Code, we find no abuse of discretion in the trial court's ruling that it was in the best interests of the children for Mother to have the exclusive

14

right to designate the children's primary residence without geographical restriction. As a result, we overrule Father's second point of error.

### B. Mother's Other Exclusive Rights

In his last point of error on appeal, Father argues that the trial court abused its discretion in awarding Mother the exclusive rights to consent to the children's health and mental health care needs, make decisions about their education, maintain their passports, consent to marriage or enlistment of the children in the armed forces, represent the children in legal action, act as the children's agent, and receive services and earnings of the children, except as provided by Section 264.0111 of the Texas Family Code.

"The court shall specify the rights and duties of a parent that are to be exercised . . . exclusively by one parent." TEX. FAM. CODE ANN. § 153.071. "The court may limit the rights and duties of a parent appointed as a conservator if the court makes a written finding that the limitation is in the best interest of the child." TEX. FAM. CODE ANN. § 153.072. Here, the trial court found that Mother's possession of these exclusive rights was in the children's best interests.

The record showed that Father had interfered in Mother's attempts to obtain schooling and adequate medical care for the children. Father had also taken Mother's green card, had threated to take the children to Italy without Mother's consent, has previously moved the children to a location undisclosed to Mother, and had failed to relinquish J.L.N.'s social security card when needed. The trial court also heard that Father refused to cooperate with Mother on even simple tasks, such as picking up medication for his son, and would withhold information and consent to decisions involving the children just to place undue burdens on Mother. Due to the record presented in this case, we find no abuse of discretion in the trial court's finding that providing

15

Mother with the complained-of exclusive rights was in the children's best interests. As a result, we overrule Father's last point of error.

## V. Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted: August 3, 2020
Date Decided: August 19, 2020