

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| IN THE INTEREST OF D.A.T., | § | No. 08-23-00308-CV |
| | § | |
| Minor Child. | § | Appeal from the |
| | § | |
| | § | 166th District Court |
| | § | |
| | § | of Bexar County, Texas |
| | § | |
| | § | (TC# 2014CI13033) |
| | § | |

# MEMORANDUM OPINION

This is an appeal from an order in a suit to modify the parent-child relationship. Tara Grays (Mother) challenges three distinct rulings: (1) the jury's finding and the trial court's award of the exclusive right to determine the child's primary residence to Isidro L. Trevino (Father), (2) the trial court's assessment of retroactive child support against Mother, and (3) the trial court's rendering of a judgment against Mother for retroactive child support. For the reasons that follow, we affirm the trial court's judgment as modified.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father were married in March 2012 and divorced in 2017 after they ceased to live together as husband and wife in about July 2013. Mother and Father's son, D.A.T., was six years old at the time of their divorce. They were each appointed as joint managing conservators of D.A.T. by the final decree of divorce. Specifically, Mother was named as the joint conservator with the exclusive right to designate D.A.T.'s primary residence, but her exercise of this right was limited to the continental states of the United States of America. A Standard Possession Order set forth the parties' periods of access and possession. As for child support, the decree ordered that Father was not obligated to pay child support, while Mother was ordered that she continue to provide health, vision, and dental insurance for D.A.T.

In June 2019, Mother filed a motion to modify the parent-child relationship, asserting a material and substantial change in circumstance required the lifting of the geographical restriction on the child's primary residence. Father answered her suit with a general denial and a counter-petition that also sought modification of prior orders. Specifically, Father sought appointment as sole managing conservator of D.A.T., which includes the exclusive right to designate the primary residence of the child.[1] Additionally, he requested for Mother to be appointed a possessory conservator, for Mother's access and possession of D.A.T. to be restricted and supervised, and for Mother to pay him monthly child support. Father's child support request specifically asked for it to be paid beginning on the day that the court rendered the final order, or the first day of the month following its determination; and he further sought an order for temporary child support during the pendency of the case. Mother answered Father's counter-petition with a general denial and she

---

[1] Tex. Fam. Code Ann. § 153.132(1).

included in her pleading a request for a finding that Father had filed his suit frivolously or in a manner designed to harass her.

In July 2019, the trial court held a hearing on temporary orders.[2] As relevant here, the trial court appointed Father as the temporary joint managing conservator with the exclusive right to designate D.A.T.'s primary residence, restricted to Bexar County, Texas. Mother was also appointed as a temporary joint managing conservator. Neither parent was ordered to pay child support until further orders of the court. Various orders affecting the parties and the child were included in the court's temporary orders, as follows: (1) the court appointed an amicus attorney, who was ordered to formulate recommendations for the court, (2) the court ordered that a social study of the parties, their homes, and the circumstances of the child be prepared by Dina Trevino, Ph.D., and (3) the court ordered that D.A.T. receive therapy from a therapist jointly selected by the amicus attorney and Dr. Trevino.

On November 15, 2022, Mother filed a motion for non-suit. The district court granted the motion and dismissed the petition with prejudice to refiling in the current proceeding, noting a jury trial had already been assigned by that date.

The case soon proceeded to a jury trial and partial bench trial based on Father's counter-petition only. First, the jury decided whether the prior order designating Mother as the conservator who had the exclusive right to designate the primary residence of D.A.T. should be modified to designate Father as holding that right. The jury answered "Yes." Second, all the remaining issues were next tried to the bench. On September 14, 2023, the trial court signed a final order modifying

---

[2] The temporary orders were rendered and entered in the court's records on July 22, 2019 but signed on October 10, 2019. The orders continued in force until further orders of the court.

the parent child relationship.[3]  Relevant to the appellate issues, the trial court's final order provided as follows:

- Mother and Father were appointed as joint managing conservators.

- Father was awarded the exclusive right to designate D.A.T.'s primary residence without a geographical restriction.

- It was ordered that Mother was obligated to pay child support in the amount of $1,038.01 per month, with the first payment being due and payable on April 1, 2023, and a like payment due on May 1, 2023. Thereafter, Mother must pay to Father child support in the amount of $1,125.98 per month beginning on June 1, 2023, and a like payment being due and payable on the first day of each month thereafter until one of the events specified for termination were met.

- It was ordered that Mother was assessed retroactive child support from August 1, 2019, to March 31, 2023, in the amount of $38,905.18.

- It was also ordered that a judgment was granted against Mother and in favor of Father in the amount of $38,905.18, with interest as provided by law, for retroactive child support. Mother was further ordered to pay the retroactive child support judgment by paying $200 each month beginning April 1, 2023, and continuing a like payment on the same day of each month thereafter until the arrearage is paid in full.

---

[3] The order stated that the trial court heard the case in November 2022 (the dates of the jury trial) and April 4, 2023. Our record on appeal does not contain a transcript or record from any hearing outside the jury trial. We address the absence of the bench-trial portion of the case under issue two.

Although Mother requested findings of fact and conclusions of law, none were entered by the court. Mother also filed a motion for new trial, which was overruled by operation of law. This appeal followed.

## II. ISSUES ON APPEAL

Mother presents three issues. First, she contends the trial court abused its discretion in denying her motion for new trial, arguing the evidence at trial was factually insufficient to support the jury's determination that Father should have the exclusive right to determine D.A.T.'s primary residence. Second, she maintains the trial court abused its discretion in awarding retroactive child support to Father. Third and relatedly, she urges the trial court abused its discretion by awarding a judgment for retroactive child support.

Although we address each issue in numerical order, we combine the second and third issues together.

## III. THE CHILD'S PRIMARY RESIDENCE

In her first issue, Mother contends the evidence was factually insufficient to support the jury's determination that Father should have the exclusive right to determine the primary residence of D.A.T. She argues the trial court abused its discretion in denying her motion for new trial.

### A. Standard of review

Ordinarily, we review a trial court's modification order for a clear abuse of discretion. *Long v. Long*, 144 S.W.3d 64, 67 (Tex. App.—El Paso 2004, no pet.); *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). But when a jury reaches a verdict following a trial, as is applicable here, a trial court may not contravene the jury's verdict that determines which of the joint managing conservators has the exclusive right to designate the primary residence of the child. Tex. Fam. Code Ann. § 105.002(c)(1)(D). Rather, the jury's verdict is reviewed for legal and factual

5

sufficiency. *See Lenz v. Lenz*, 79 S.W.3d 10, 17 (Tex. 2002) (applying legal sufficiency standard to review of jury verdict); *Alexander v. Rogers*, 247 S.W.3d 757, 761 (Tex. App.—Dallas 2008, no pet.) (holding legal-and factual-sufficiency review applies to jury verdict). *Cecil v. Smith*, 804 S.W.2d 509, 512 (Tex. 1991) (citing Tex. R. Civ. P. 324 (b)). A motion for new trial preserves error for review on a factual insufficiency complaint. ("Factual insufficiency points of error are expressly required by Rule 324(b) to be raised in a motion for new trial."); *see also* Tex. R. App. P. 33.1.

In conducting a factual sufficiency review, we must consider all the evidence supporting or contradicting the fact-finder's determination. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We may only set aside a verdict if the evidence supporting it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When conducting a factual sufficiency review, a reviewing court must not merely substitute its judgment for that of the jury. *Golden Eagle Archery v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). And it must also recognize that the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.*

### B. Applicable law

Under the Texas Family Code, a court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of conservatorship, or that provides for the possession of or access to a child, if it is shown that: (1) there has been a material and substantial change in the circumstances of the child, a conservator, or other party affected by the order, since the earlier of the date of the rendition of the order, or the date of the signing of a mediated settlement agreement, and (2) the modification of the order would be in the child's best interest. *See* Tex. Fam. Code Ann. § 156.101(a)(1)(A); *Lenz*, 79 S.W.3d at 14. The

public policy of the state is to assure that children will have frequent and continuing contact with parents who have shown the ability of acting in the best interest of the child; to provide a safe, stable, and nonviolent environment for the child; and to encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage. *See* Tex. Fam. Code Ann. § 153.001.

Here, the parties do not dispute whether there was a material or substantial change in circumstances since the rendition of the divorce decree. To that extent, the first requirement of a modification was met. As for the second requirement, Mother challenges the jury's determination that Father should have the exclusive right to determine their child's residence in Bexar County, Texas. She argues the evidence is factually insufficient to support the jury's determination that Father's right to determine the child's primary residence is in the child's best interest.

As for a best interest finding, the Supreme Court of Texas enumerated a non-exhaustive list of factors to be considered. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

## C. Record evidence

### (1) Mother's and Father's testimony

Three witnesses testified at trial: Father, Mother, and Dr. Trevino, the licensed psychologist who performed a child-custody evaluation and social study. Exhibits were also admitted into evidence, to include Dr. Trevino's written child-custody evaluation, prior court orders relevant to the parties, and multiple photographs of D.A.T. The testimony at trial established that Father owned a home located in San Antonio. At the time of trial, Father was retired after working 21 years with the United States Border Patrol. Father had three other adult children.

Mother is currently working as an officer of the Department of Homeland Security assigned to Customs and Border Protection (CBP). After divorcing Father, Mother married Johnny Grays, a CBP co-worker. In addition to D.A.T., Mother has three other children: a boy older than D.A.T. who lives with his father in Texas, and another boy and girl younger than D.A.T. who live with Mother and her husband. In 2017, when the parties' divorce decree was entered, D.A.T. then lived with Mother in Ashburn, Virginia. In November of that year, Mother moved with D.A.T. to Troy, Michigan. Mother described that several reasons had led to the move, including that she had transferred positions with CBP, that she was seeking healthcare for D.A.T. that was unavailable where they had been living, and that her husband had been living in Michigan. In May 2018, Mother moved from Troy to Applegate, Michigan. In March 2019, Mother and her husband both accepted a temporary detail in St. Simons Island, Georgia, where they both attended an instructor's academy for their jobs.

In July 2019, D.A.T. went to San Antonio for his summer visitation with Father. During this visit, D.A.T. told Father that he was physically abused by Grays, his step-father. Father testified that D.A.T. had described to him that Grays had been throwing limes and oranges at him

8

and threatened him with a knife. CPS investigated the incident but soon closed the case after determining that Grays and D.A.T. had often thrown socks at each other and no evidence established Grays had posed a danger to D.A.T. or had mistreated him. Soon after the incident, Father obtained temporary primary conservatorship of D.A.T. by means of a temporary order.

After completing her assigned detail in Georgia, Mother moved back to Michigan while D.A.T. stayed with Father in San Antonio. Mother later accepted an assignment to Aruba and lived there with her two youngest children from November 2020 to February 2022. During that timeframe, Mother did not visit D.A.T. and he did not visit her. In February 2022, Mother moved to Anthem, Arizona, near Phoenix, where she started a new position working with the federal government's Bureau of Indian Affairs.

### (2)   Testimony of the child custody evaluator

In addition to Mother's and Father's testimony, Dr. Trevino also testified as to her child custody evaluation. Her written report dated November 12, 2022, was also admitted into evidence. In completing her evaluation, Dr. Trevino individually interviewed Mother, Father, D.A.T.'s amicus attorney, and D.A.T.'s therapist. She also reviewed extensive documents submitted by the parties and those she obtained from other professionals; she interviewed collateral witnesses in person or by videoconferencing; she reviewed written questionnaires completed by one or more parties; and she conducted home visits of each parent's household. Dr. Trevino's written report recommended that Mother and Father be named joint managing conservators, and that Father have the exclusive right to establish D.A.T.'s residency.

### D.   Analysis

Mother contends the evidence supporting the jury's determination of the child's primary residency is so weak it was manifestly unjust and wrong, and the trial court abused its discretion,

9

by refusing to grant a new trial. In weighing the *Holley* factors, she contends the evidence does not support a modification of the parties' divorce decree because she claims that Father having the exclusive right to designate the child's primary residence is not in D.A.T.'s best interest. Specifically, she argues the evidence is factually insufficient to support the jury's verdict because, among other things, the greater weight of the evidence established that: (1) Father had failed to care for D.A.T.'s dental hygiene during his periods of possession; (2) D.A.T. received bed-bug bites while living at Father's house; (3) D.A.T. had issues with his weight and Father fed him fast food; (4) D.A.T. developed a nervous tick while in Father's care; and (5) Father did not take part in D.A.T.'s therapy. Additionally, she contends the greater weight of the evidence established she was better suited to care for D.A.T. because she took care of his dental issues, she fed him a healthy diet, and she frequently checked in on his progress in therapy. Mother points to testimony throughout trial to support her position. We conclude the evidence Mother points to does not conclusively establish that Father should not have the exclusive right to designate the child's primary residence or that the evidence the jury relied on to conclude that he should be granted that right is so weak that it is outweighed by the greater weight and preponderance of the evidence admitted at trial.

Pertinent to the *Holley* factors, the record shows the jury heard conflicting evidence about whether a modification of the parties' divorce decree would be in the child's best interest to the extent of modifying the naming of the conservator with the right to designate the child's primary residence. For example, the jury heard evidence that, since the rendering of the 2017 decree, Mother had moved at least five times as follows: to Troy, Michigan, in November 2017; to Applegate, Michigan, soon thereafter; to St. Simons Island, Georgia, in March 2019; to Aruba in November 2020; and lastly, to Anthem, Arizona, in February 2022. During that timeframe, the

10

jury also heard evidence that Father consistently lived in San Antonio. Moreover, Dr. Trevino's report described that Father provided a more stable living situation as he had no plans to move; yet, based on Mother's past history, her living situation was less predictable.

As for the child's desires, the jury received evidence that D.A.T. had expressed that he felt hurt and abandoned by Mother. Dr. Trevino's report described that "[D.A.T.] has consistently expressed hurt, abandonment, and rage vis-à-vis his mother," and that "[h]e gradually has become more accustomed over the last few years to his mother's absence, and his anger does not appear as raw, but continues to feel safer and more accepted with his father." The report further documented that Mother had expressed her concerns that Father talked negatively to D.A.T. about her and it affected him negatively about wanting to see her. Mother acknowledged that each time D.A.T. returned to see her after being with Father, she needed to readdress the same issues while D.A.T. openly cursed at her, threatened her, and told her how much he hated her. Mother reported she felt that Father had been alienating D.A.T. from her.

While the evidence did show that Father encouraged D.A.T.'s negative feelings towards Mother, the record also established that D.A.T. had expressed that he felt safe and well-accepted by his Father. Additionally, although there was no evidence suggesting or establishing that his step-father, Johnny Grays, had posed any danger to him, the evidence nonetheless showed that D.A.T. struggled emotionally when visiting Mother's home. Specifically, during D.A.T.'s summer 2022 visitation with Mother, D.A.T. grabbed a knife and tried to hurt himself during a time when Mother was not at home. D.A.T. told Father that his step-father and his step-brother handcuffed him on the occasion and sat him outside until Mother returned home. Although Mother acknowledged the event at trial, she disputed the detail that D.A.T. had been handcuffed during the incident.

As for Dr. Trevino's trial testimony, Mother asserts she contradicted her written evaluation report. Specifically, Mother points to testimony of Mother's involvement with D.A.T.'s therapy; Father's ability to meet D.A.T.'s physical needs; the involvement of each parent in D.A.T.'s daily activities and in meeting his needs; the comparison of the stability of each parent's home; and what D.A.T. expressed to her about where he wanted to live. Mother argues the evidence supporting Dr. Trevino's recommendation that Father should be granted the right to determine the primary residence of D.A.T. was factually insufficient to support the jury's finding. We conclude that Mother has misapplied this standard of review.

To show factual insufficiency, Mother must establish the evidence was "so weak or the verdict so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *In re S.K.H.*, 324 S.W.3d 156, 159 (Tex. App.—El Paso 2010, no pet.) (citing *Cain*, 709 S.W.2d at 176). As for any inconsistencies between Dr. Trevino's testimony and her report, the jury resolved any contradictions by its verdict in favor of Father. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

In summary, from all the evidence presented at trial, we conclude the jury could have reasonably determined that Father should have the right to designate D.A.T.'s primary residence and it served the child's best interest. Juries are to decide the credibility of the witnesses, including whether to believe one witness and disbelieve another, and the weight to be given to testimony. *Wilson*, 168 S.W.3d at 819. The jury had sufficient facts to determine the contested issue; and in this instance, the trial court was statutorily required to defer to the jury's decision. *See* Tex. Fam. Code Ann. § 105.002(c)(1)(D).

Mother cites us to a case she claims contains similar facts, and in which the court concluded it was in the children's best interest to remain with their mother. *See Interest of C.S.*, No. 04-20-

12

00421-CV, 2021 WL 5496159, at *4 (Tex. App.—San Antonio Nov. 24, 2021, no pet.) (mem. op.). We conclude, however, that Mother's cited case is inapposite. There, the trial court, after a bench trial, had denied the father's request to be named the conservator with the exclusive right to designate the primary residence of the children but retained the mother as the conservator with that right. *Id.* at *1. Notably, the sufficiency of the evidence to support the trial court's best interest finding was not an issue on appeal. *Id.* at *1–2. Rather, the father was appealing the trial court's failure to interview the children in chambers, and in reviewing that complaint, the Fourth Court of Appeals concluded the lack of interview did not cause the rendition of an improper judgment. *Id.* at *4. We conclude that Mother's cited authority does not support her proposition that the evidence presented was so weak that it was clearly wrong and manifestly unjust.

We overrule Mother's first issue.

## IV. RETROACTIVE CHILD SUPPORT

In her two remaining issues, Mother contests the trial court's award of retroactive child support. Specifically, the trial court ordered the following:

> It is ORDERED that [Mother] is assessed retroactive child support from August 1, 2019, to March 31, 2023, in the amount of $38,905.18.

> IT IS THEREFORE ORDERED that a judgment is granted against [Mother] and in favor of [Father] in the amount of $38,905.18 with interest as provided by the law of the State of Texas; for collection and distribution according to law.

Mother's second issue argues the trial court erred in ordering her to pay retroactive child support because Father provided no notice that he intended to seek such relief. And in her third issue, Mother urges the trial court erred in awarding a judgment in favor of Father and against her for retroactive child support because no enforcement action had been brought for such unpaid support.

13

### A. Applicable law and standard of review

"There are four 'types' of child support that a court may order one parent to pay to the other—temporary, current, medical, and retroactive." *In re B.R.F.*, 457 S.W.3d 509, 510 (Tex. App.—El Paso 2014, no pet.) (citation omitted). As relevant here, the term "retroactive support" refers to at least two concepts. *In re J.G.Z.*, 963 S.W.2d 144, 146 (Tex. App.—Texarkana 1998, no pet.). First, "[r]etroactive support can be ordered in instances where child support has not been previously ordered." *Id.*; *see also* Tex. Fam. Code Ann. § 154.009(a)(1). Second, Texas courts can also "*retroactively modify* existing child support obligations." *In re J.G.Z.*, 963 S.W.2d at 146. Child support can also be ordered in instances where it has not been previously ordered. *Id.*

A trial court's award of retroactive child support is reviewed for an abuse of discretion. *Id.*; *see also Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam). The test is whether the court acted arbitrarily or unreasonably, or without reference to guiding rules and principles. *Worford*, 801 S.W.2d at 109.

### B. Fair notice

In her second issue, Mother argues she was not provided with notice that Father was seeking retroactive child support from her. She points out that Father's counter-petition only requested child support that would begin on the day the trial court rendered a final judgment, or on the first day of the month following the court's child support determination.

In Texas, fair notice ordinarily provides sufficient notice to a party. *Taylor v. Taylor*, 337 S.W.3d 398, 401 (Tex. App.—Fort Worth 2011, no pet.); *see also* Tex. R. Civ. P. 45(b), 47(a). (providing that pleadings must give "fair notice of the claim involved"). However, "[s]pecific notice is required when retroactive child support is being sought." *In re J.G.Z.*, 963 S.W.2d at 148.

14

Here, among his claims, Father's counter-petition requested that he be appointed sole managing conservator, and that Mother be denied access to the child. He also asserted that Mother should be obligated to support the child and should be ordered to make payments in the manner specified by the court. On final hearing, his counter-petition asked for that support to begin on the day the court rendered the final order or the first day of the month following the determination of child support. As for temporary orders, however, Father's counter-petition also asked for the trial court to "issue an order for temporary child support to be paid by [Mother] to [Father] for the benefit of the child subject to this suit during the pendency of this case." And following a hearing on temporary orders, the trial court rendered temporary orders, effective July 2019, which provided that Father was appointed the temporary joint managing conservator with the exclusive right to designate the child's primary residence. The temporary orders further determined that neither party was ordered to pay or be entitled to receive child support from the other party.

After the jury found that Father should have the exclusive right to determine the child's primary residence, the trial court subsequently rendered a final order incorporating the jury's residency determination. For the period from August 1, 2019, to March 31, 2023, or during the pendency of the case, the trial court assessed retroactive child support against Mother in the total amount of $38,905.18.[4]

We conclude that Father's counterpetition provided Mother specific notice that Father sought child support during the pendency of the case after the counterpetition's filing. *See M.G. v. T.G.*, No. 02-21-00433-CV, 2023 WL 2178762, at *4 n.13 (Tex. App.—Fort Worth Feb. 23, 2023,

---

[4] As for prospective child support, the trial court ordered that Mother was obligated to pay child support of $1,038.01 per month with the first payment being due and payable on April 1, 2023, and a like payment for May 1, 2023, and a payment of $1,125.98 per month beginning on June 1, 2023, and each month thereafter until terminated as specified by the order.

no pet.) (mem. op.) ("The language in [father's] counterpetition requesting a temporary order requiring [mother] 'to provide child support and medical support as deemed appropriate by the Court' provided [mother] fair and adequate notice that [father] sought child support during the case's pendency but after the counterpetition's filing."); *Taylor*, 337 S.W.3d 398 at 401 (finding fair notice of request for child support during the pendency of the case when pleadings requested the father "be ordered to make payments for the support of the child" "and further sought a temporary order for child support 'while this case is pending'").

Additionally, we conclude that Mother otherwise failed to show the issue of retroactive child support was not tried by consent. Although neither party presented evidence concerning child support during the jury trial, it is clear from our record that a separate bench trial was held on other matters on April 4, 2023. Following this hearing, the trial court entered "Additional Orders" where it made the finding of child support and retroactive child support. The reporter's record for the April hearing is not part of our record. "The appellant bears the burden to ensure that a sufficient appellate record is presented to show reversible error." *Interest of C.J.*, 689 S.W.3d 417, 421–22 (Tex. App.—Dallas 2024, no pet.). If an appellant fails to present a complete reporter's record on appeal, the appellate court must presume the omitted portions are relevant and support the trial court's judgment. *See id.* at 422; *see also* Tex. R. App. P. 34.6(c)(4).

Accordingly, we must conclude the trial court had sufficient evidence before it to assess retroactive child support. We overrule Mother's second issue.

### C. Arrearage judgment

In her third issue, Mother contends the trial court abused its discretion when it awarded a judgment in the amount of $38,905.18 for retroactive child support. She argues the retroactive child support was prospective, the trial court made no findings that she was in arrears for any

16

support, and Father brought no enforcement action under Chapter 157 of the Texas Family Code. In response, Father concedes he is not entitled to a judgment on the retroactive child support until such time that Mother becomes delinquent.

It is clear from the record here that there was no arrearage upon which a cumulative judgment could be entered. *See* Tex. Fam. Code Ann. § 157.263. Even though we have concluded that Father's counter-petition requested child support from the time of his petition's filing, he did not also include a request for a judgment against Mother. Although the trial court called the retroactive support a "judgment," it was instead a child support order. *See In Interest of J.G.Z.*, 963 S.W.2d at 148. A judgment could only be supported if Mother failed to make payment in the future as required by the order.

Accordingly, we sustain Mother's third issue with respect to the awarding of a judgment against her in the amount of $38,905.18.

## V. CONCLUSION

We strike that part of the trial court's judgment which awards a judgment of $38,905.18 against Mother. As modified, we affirm the judgment.

GINA M. PALAFOX, Justice

February 28, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

17